Timothy J. KNUTSON, Plaintiff,

v.

AG PROCESSING, INC., Defendant.

No. C01–3015–MWB.

United States District Court,
N.D. Iowa,
Central Division.

July 28, 2003.

966

Blake Parker, Blake, Parker Law Office, Fort Dodge, IA, Michael J. Carroll, Coppola, Sandre, McConville & Carroll, PC, West Des Moines, IA, for Plaintiff.

Becky S. Knutson, Davis, Brown, Koehn, Shors & Roberts, Des Moines, IA, for Defendant.

MEMORANDUM OPINION AND OR-
DER REGARDING DEFEN-
DANT'S MOTION FOR JUDG-
MENT AS A MATTER OF LAW,
OR, ALTERNATIVELY, FOR NEW
TRIAL; PLAINTIFF'S MOTION
FOR PROHIBITORY INJUNC-
TION, FOR REINSTATEMENT;
PLAINTIFF'S MOTION FOR AT-
TORNEY'S FEES AND COSTS

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .973
 A. Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .973
 B. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .975
 1. AGP and Mr. Knutson's position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .975
 2. Mr. Knutson's injuries and resulting work restrictions . . . . . . . . . . . . . . .976
 3. AGP's response to Mr. Knutson's comments in the log book . . . . . . . . . . .977
 4. Mr. Knutson's back surgery, his termination, and the videotape . . . . .978
 5. The "safety" rule Mr. Knutson allegedly breached . . . . . . . . . . . . . . . . . . .980

II. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .981
 A. Motion for Judgment as a Matter of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . .981
 1. Applicable standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .981
 2. Sufficiency of the evidence—disability discrimination . . . . . . . . . . . . . . . .983
 a. Perceived disability claim: Essential elements . . . . . . . . . . . . . . . . . . .983
 b. Element 1: Disability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .984
 i. Substantially limited in major life activity of working,
 generally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .986

 ii. Did Mr. Knutson produce sufficient evidence that AGP
 regarded him as disabled? ...............................988
 c. Element 2: Qualified individual ................................990
 i. Defining essential functions, generally .....................990
 ii. Are pulling bottom ash and rodding the stokers essential
 functions of the job? ....................................991
 d. Element 3: Causality .........................................994
 3. Sufficiency of the evidence—punitive damages ....................999
 a. Applicable standards ..........................................999
 b. Analytical framework ........................................1001
 c. Malice or reckless indifference ..............................1002
 B. Plaintiff's Motion for Prohibitory Injunction and Reinstatement .........1004
 1. Prospective equitable relief available under the ADA ................1004
 2. Appropriateness of reinstatement .................................1005
 3. Prohibitory injunction .........................................1011
 4. Front pay ......................................................1011
 C. Motion for Attorney's Fees .......................................1012
 1. Applicable standards ............................................1012
 2. Reasonable hourly rate ..........................................1013
 3. Hours reasonably expended .......................................1016
 a. Inadequate documentation of time ............................1016
 b. Partial success/dismissed claims ............................1016
 4. Calculation of attorney fee award ...............................1019
 5. Is Mr. Knutson's counsel entitled to an enhancement of the
 lodestar? ......................................................1019
 D. Recoverable Costs and Expenses ....................................1020
 1. Charges for the investigator ....................................1021
 2. Other expenses ................................................1022

III. CONCLUSION ...............................................1022

After a two-day jury trial in this perceived disability employment discrimination case, the jury returned a verdict in favor of the plaintiff. The jury awarded the plaintiff backpay and punitive damages, apparently having determined that the plaintiff did not suffer any emotional distress damages resulting from the defendant's unlawful conduct. A flurry of post-trial motions followed the jury's disposition of this case. In these motions, the plaintiff seeks reinstatement, injunctive relief, and attorney's fees, costs, and expenses. The defendant contests each of the plaintiff's requests and, for its part, seeks judgment as a matter of law, claiming that the plaintiff failed to establish a perceived disability claim under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* and its state-law counterpart under the Iowa Civil Rights Act. Furthermore, the defendant asserts that, even if he did establish such a claim, he is not entitled to punitive damages.

## I. INTRODUCTION

### A. Procedural History

On February 21, 2001, plaintiff Timothy J. Knutson filed a complaint against his former employer, defendant Ag Processing, Inc. ("AGP"), seeking damages resulting from his termination on March 13, 2000. In his complaint, Knutson alleged three causes of action: (1) a claim of disability discrimination pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.;* (2) a similar claim under the Iowa Civil Rights Act ("ICRA"), Iowa Code Chapter 216 *et seq.;* and (3) a state common law claim for retaliatory discharge in violation of public policy. On his disability discrimination claims, Mr. Knutson alleged that he was disabled within the meaning of the ADA because he

was actually disabled, perceived as disabled, and had a record of disability. With respect to his state common law claim, Mr. Knutson asserted that he was fired in retaliation for seeking workers' compensation benefits.

Defendant AGP answered Mr. Knutson's complaint on May 11, 2001, denying Mr. Knutson's claims and asserting various defenses. On September 4, 2002, AGP filed a Motion for Summary Judgment on each of Mr. Knutson's claims with the exception of his "perceived disability" claim. First, in its motion, defendant AGP claimed that Mr. Knutson was not "disabled" within the meaning of either the ADA or the ICRA because he was not actually disabled nor did he have a record of disability. Second, AGP claimed that Mr. Knutson's failure-to-accommodate claim was irrelevant because it did not discharge him because of any physical limitation but instead discharged him for violating AGP company policy when he made an unauthorized videotape inside AGP's energy plant, where he worked. Third, AGP asserted that Mr. Knutson could not establish the necessary elements for his claim of retaliatory discharge because he failed to demonstrate a causal connection between the protected activity and the adverse employment action. AGP also asserted that Mr. Knutson could not show that its stated reason for terminating Mr. Knutson's employment, *i.e.*, the videotaping, was pretextual.

After reviewing the parties' briefings and holding telephonic oral argument on the defendant's summary judgment motion, in an Order dated October 29, 2002, the court granted AGP's motion insofar as it argued Mr. Knutson did not have a record of disability and did not generate a genuine issue of material fact regarding his discharge in violation of public policy claim. The court, however, concluded that

Mr. Knutson generated triable issues as to whether he had an actual disability and, therefore, denied AGP's summary judgment motion on that claims. Prior to trial, Mr. Knutson abandoned his claim that he was actually disabled. Thus, the sole claim that remained to be tried to the jury after the court's ruling on the defendant's summary judgment motion was Mr. Knutson's perceived disability discrimination claim.

The parties proceeded to trial beginning February 24, 2003 in Fort Dodge, Iowa. On February 26, 2003, the jury returned a verdict in favor of Mr. Knutson and awarded him $55,345.72 in backpay and $90,000.00 in punitive damages. The jury did not award him any past or future emotional distress damages and, furthermore, found that AGP failed to prove by the greater weight of the evidence that it would have terminated Mr. Knutson even if it had not considered his perceived limitations.

At trial and in these post-trial motions, Mr. Knutson was represented by Blake Parker of Blake Parker Law Office, Fort Dodge Iowa. On his request for attorney's fees, Mr. Knutson was also represented by Michael Carroll of Coppola, Sandre, McConville & Carroll, P.C., West Des Moines, Iowa. AGP was represented by Becky Knutson of Davis, Brown, Koehn, Shors & Robert, P.C., Des Moines, Iowa. Presently before the court are the defendant's Motion for Judgment as a Matter of Law, or, Alternatively, New Trial (Doc. No. 64); plaintiff's Motion for Prohibitory Injunction and Reinstatement (Doc. No. 62); and plaintiff's Motion for Attorney's Fees and Costs (Doc. No. 68).

The basis of AGP's Motion for Judgment as a Matter of Law, or, Alternatively, New Trial, which was brought pursuant to Federal Rule of Civil Procedure 50,[1] centers

---

1. Although captioned as an alternative request for a new trial, AGP limited its request

for relief in its post-trial motion to judgment

on AGP's contention that Mr. Knutson failed to establish each of the essential elements of a "regarded as" disability claim under the ADA. Moreover, AGP claims that Mr. Knutson is not entitled to punitive damages because he did not show that AGP acted with "malice or reckless indifference" to his federally protected rights. In Mr. Knutson's Motion for Prohibitory Injunction and Reinstatement, he asks the court to utilize its equitable powers and to order reinstatement, in combination with an injunction enjoining the defendant from discriminating against him. AGP resists reinstatement, and Mr. Knutson has requested front pay only if the court determines that reinstatement is inappropriate. As the prevailing party in a civil rights action, the plaintiff has also requested attorney's fees and costs pursuant to 42 U.S.C. § 12205—the ADA's fee-shifting statute. Both parties filed a timely resistance to the opposing party's various post-trial motions, and the court finds that the case is now ripe for disposition.

## B. Factual Background

As will be discussed more fully below, the court recites these facts in the light most favorable to Mr. Knutson, according him the benefit of all reasonable inferences drawn from the evidence presented at trial. *See Minneapolis Cmty. Dev. Agency v. Lake Calhoun Assocs.*, 928 F.2d 299, 301 (8th Cir.1991).

### 1. AGP and Mr. Knutson's position

According to the evidence presented at trial, Mr. Knutson began working at AGP's Eagle Grove, Iowa energy plant on June 24, 1988. AGP is an Iowa corporation with its corporate headquarters located in Omaha, Nebraska. APG's primary business is soybean crushing and producing crude soybean oil and meal. AGP has eight soybean crushing plants located in Nebraska, Minnesota, Missouri, and Iowa, including one located in Eagle Grove. Though Mr. Knutson performed in many capacities throughout his tenure at AGP, pertinent to this litigation, he was a "boiler operator," also known as a "process operator." AGP employed four individuals in this capacity, and their function was to ensure that the boilers ran properly and efficiently. The use of boilers at the Eagle Grove soybean processing plant was critical to AGP's competitive edge because, through the burning of coal in the boilers, AGP produced its own steam energy for processing, thereby cutting its overhead costs.

The job of boiler operator has two main components. The first component is as the control room operator. The boiler operator spends approximately eight hours of a 12–hour shift in this capacity as the control room operator. In the control room, he or she watches gauges and ensures that the temperature is correct and that the boilers are being controlled properly. The boilers at AGP are self-filled with coal, and the controls in the control room designate which boiler is burning coal, how much coal it is burning, and at what rate. The control room operator is able to change the speed that the stokers fill the boilers with coal so as to maintain consistent output. The stokers, in turn, are mechanical devices that feed coal into the boilers by ramming the coal through a fan-like mechanism, which throws the coal into the burner at varying distances, resulting in even disbursement and, consequently, burning of the coal.

The control room operator function of the boiler operator position can be performed while sitting and does not entail any physical exertion. The second component of the boiler operator position, in contrast, involves "pulling bottom ash" and "rodding the stokers." To pull bottom ash, the boiler operator uses a 31–pound

as a matter of law and did not move for a new trial under Rule 59.

rake mounted on wheels to clean and distribute the ash and unburned coal from the boiler. To rod the stokers, the operator uses a rod and, in an overhead motion, punches coal down into the burners.

### 2. Mr. Knutson's injuries and resulting work restrictions

Mr. Knutson's medical problems began in 1998. In October of that year, he had surgery to repair a hernia. While hospitalized, he contracted pneumonia and was unable to return to work at AGP until November, 1998. However, when he was able to return to work, he did so without any restrictions. A month later, in December 1998, Mr. Knutson suffered a shoulder injury, which was arguably work-related. His shoulder injury required surgical intervention. When Mr. Knutson returned to work after that surgery, he did so with work restrictions. His physician, Dr. Palit, restricted him from lifting over 25 pounds and from doing any overhead work, such as rodding the stokers. AGP put Mr. Knutson back to work as a boiler operator and had cross-trained utility employees, Ed Askvig and Doug Lilly, to rake ash and rod the stokers. Eventually, Dr. Palit released Mr. Knutson to work without any restrictions.

Nevertheless, Mr. Knutson continued to suffer from back pain related to his repaired hernia. Consequently, in May of 1999, he returned to the doctor who had performed the hernia repair, Dr. Warlick. Dr. Warlick imposed work restrictions on Mr. Knutson that precluded him from pulling ash. Mr. Knutson continued as a boiler operator, and AGP again had Mr. Askvig or Mr. Lilly pull the bottom ash. The restrictions did not impede Mr. Knutson's ability to perform the control room operator function of his job, nor did they preclude him from rodding the stokers. However, whether it was Mr. Knutson's choice or simply a convenience, Mr. Askvig or Mr. Lilly ordinarily rodded the stokers, too.

Neither Mr. Knutson nor AGP noted the duration of Mr. Knutson's restrictions. From May of 1999 until October of 1999, Mr. Knutson continued to perform the control room operator function of his boiler operator position and continued to occasionally rod the stokers, with Mr. Askvig or Mr. Lilly raking bottom ash and sometimes rodding the stokers. However, on October 6th and 7th of 1999, the automatic coal feeders were "acting up." Mr. Knutson and the other boiler operators in the control room on those days were required to excessively rod the stokers in order to keep the heat levels sufficiently high to produce enough steam to generate power for the plant. On an average day, a boiler operator would rod the stokers once during his or her shift to break up any large pieces of coal that were not being fed properly into the boiler. When the coal is not properly fed into the boiler, not enough steam is produced to power the plant. As a result, AGP is forced to purchase power from the local utility company. When Mr. Knutson arrived at work on October 6, 1999, AGP was producing only two megawatts of power and purchasing three megawatts because of the problems with the coal feeder.

AGP boiler operators maintain a "control operator log" in the control room. In this log, the operators make daily notations about equipment failures, clean-up, and various other problems and concerns. Jim Brown, the energy plant superintendent, reviews this log several times per week. On October 6 and October 7 of 1999, Mr. Knutson and another boiler operator made notations in the log book complaining about the physical toll that the problem with the coal feeders was taking on their bodies because of the extra rodding and raking needed to compensate for

the poor coal distribution. [Deft.'s exh. C, Pf.'s exh. 31].

With respect to Mr. Knutson, he noted that there were large chunks of coal—football sized—stuck in the feeder. Normally, boiler operators rod coal that is much smaller than the coal present on October 6th and 7th. Generally, the coal chunks weigh less than one pound. Consequently, it is easier to break up coal of that size than it was to break up the coal that was stuck in the stokers on October 6th and 7th. Furthermore, Mr. Brown testified that on many days, the stokers do not need to be rodded at all. Thus, on October 6 and 7, 1999, the coal was larger than usual and required greater stoking than would ordinarily be required of a boiler operator.

In the log book, Mr. Knutson stated that he asked Ken Mohr, the floating supervisor for the bean plant, for an extra employee to help with the rodding but that Mr. Mohr responded that no one was available to help. Until this request, Mr. Knutson had never asked for any help rodding the stokers and had been successfully rodding them without assistance since he was released from his restrictions after his shoulder surgery. There was no evidence at trial that Mr. Knutson ever asked for assistance rodding the stokers, even though Mr. Askvig or Mr. Lilly sometimes performed the task. The excessive rodding on October 6 and October 7, 1999 aggravated Mr. Knutson's latent shoulder condition and caused him a significant amount of pain.

In the log book on October 6, 1999, he directed a comment to Mr. Brown and wrote, "Jim—This is way over the amount of heavy rodding I should be doing." [Deft.'s exh. C]. The following day he wrote, "If this [the problem with the stokers] keeps up I will not be able to keep this up.... The idea of pain pills is not to take two[,] wait an hour and go do work

that requires me to take more pain pills." [Deft.'s exh. C]. He also reiterated his request for help with the excessive rodding and noted that AGP was buying power because of the stoker problem and that surely the cost of purchasing power was greater than the additional cost of adding another employee to help with the rodding.

### 3. AGP's response to Mr. Knutson's comments in the log book

After reading Mr. Knutson's comments in the log book, Mr. Brown angrily approached Mr. Knutson and told him that he was in the process of writing him a letter and that, as soon as it was finished, Mr. Brown would give it to Mr. Knutson. Because of Mr. Brown's demeanor, Mr. Knutson was obviously concerned about the contents of the letter and, instead of waiting for Mr. Brown to finish it, Mr. Knutson talked to Carl Parker, AGP's plant manager. Mr. Parker and Mr. Brown had interpreted Mr. Knutson's log book comments to mean that he was asserting that he was working outside of his restrictions. When Mr. Parker checked Mr. Knutson's restrictions, he discovered that they had expired. Therefore, he instructed Mr. Knutson to return to the doctor in order to get current restrictions, and Mr. Knutson obliged.

Mr. Knutson went to a physician's assistant and, on October 13, 1999, received a "work status report." [Pf.'s exh. 17]. That report limited Mr. Knutson to lifting 20 pounds; no bending or stooping at waist; slow ladder and stair climbing; no shoveling; no repetitive use of the left arm and hand; limited overhead reaching to once per hour; and must be allowed to change position from sitting to standing every hour. [Pf.'s exh. 17]. Because Mr. Knutson had not been raking bottom ash, these restrictions did not materially affect the duties he had been performing when

the boilers were operating properly. As noted above, ordinarily, boiler operators normally rod the stokers, which involves overhead reaching, only once per 12-hour shift.

After receiving the restrictions, AGP informed Mr. Knutson that it did not have a position available to meet his restrictions. Therefore, it assigned him various light duty work in the energy center, as well as in other parts of the plant. However, the physician's assistant who wrote the restrictions did not provide an end date for them, and Mr. Parker instructed Mr. Knutson to return to a doctor in order to get a definite time frame for his recovery period. Accordingly, Mr. Knutson returned to the doctor, this time consulting a medical doctor.

On October 18, 1999, Mr. Knutson obtained a second set of restrictions, which differed significantly from his October 13, 1999 restrictions. [Deft.'s exh. D]. The second set of restrictions provided the following temporary limitations: no lifting greater than 15 pounds from floor to waist level; no lifting greater than 25 pounds from waist to shoulder level; no pushing or pulling greater than 75 pounds of force. This doctor also provided a permanent restriction—no more than occasional work with the left arm outstretched at shoulder level. As for the duration of these restrictions, the doctor indicated that the temporary limitations were to remain in place until Mr. Knutson underwent surgery.

While Mr. Knutson testified that he would not have been comfortable pulling bottom ash, nothing in the second set of restrictions precluded any of the duties normally associated with the boiler operator's position. Still, when he returned to work and provided AGP with the second set of restrictions, AGP continued to assign Mr. Knutson to light duty work. Pertinent to AGP's perception of Mr. Knutson's limitations, Mr. Parker, red-faced

and angry, told Mr. Knutson that he was not to operate any equipment at AGP and that he was not even to touch a button in the control room.

The work Mr. Knutson performed after providing the second set of restrictions to AGP consisted of makeshift odd jobs around the plant. For example, he held a hose that washed down the floor and drained into a floor drain. This manner of cleaning the plant floor did not require him to mop or sweep; he simply held the hose. He also did a lot of painting around the plant. Mr. Knutson did not mind the work so much as he resented being relegated to menial tasks when he felt capable of performing his boiler operator duties and when his restrictions did not preclude him from the boiler operator position. Further, his physical condition had not changed since before the new restrictions were issued, and, at that time, he was an effective boiler operator.

### 4. Mr. Knutson's back surgery, his termination, and the videotape

Mr. Knutson's medical history makes clear that he had physical difficulties and labored under a series of work restrictions. In March of 1999, in an attempt to better acquaint his doctor with the type of work he performed that was causing him the most pain, Mr. Knutson enlisted the help of Mr. Askvig to videotape the task of pulling bottom ash. The videotape, filmed by Mr. Knutson, shows Mr. Askvig raking ash. Mr. Knutson did not obtain permission from anyone at AGP to make the videotape, but neither he nor Mr. Askvig believed that they were violating any company rules. In fact, the tape was made in plain sight of plant floor supervisors.

Around this same time, Mr. Knutson was involved in a dispute with AGP concerning whether his back pain was a compensable work-related injury. Mr.

Knutson claimed that back surgery was necessitated by a work-related injury that occurred several years prior to 1999. Therefore, he filed a worker's compensation claim and argued that surgery to repair his condition should be covered by AGP's worker's compensation policy. AGP, however, disagreed and denied coverage. Mr. Knutson sought the counsel of a worker's compensation attorney, and he provided the videotape of Mr. Askvig raking coals to his attorney. Mr. Knutson's attorney, in turn and through the course of discovery, provided the tape to AGP's worker's compensation attorney. On November 26, 1999, AGP's counsel in Omaha, Nebraska, sent the tape to Mr. Parker and asked him to identify the individuals responsible for the tape.

Mr. Parker immediately recognized Mr. Askvig and confronted him about the tape. Mr. Askvig initially denied knowledge that Mr. Knutson was videotaping him but later recanted and admitted to having knowingly and willingly participated in the videotape's making. Mr. Askvig told Mr. Parker that Mr. Knutson had asked him to make the tape in order to show Mr. Knutson's doctor the task that was aggravating his shoulder and back pain and that Mr. Askvig agreed to demonstrate pulling bottom ash. Mr. Askvig was subsequently disciplined but *not* for appearing in or participating in the making of the "unauthorized" videotape. Instead, he was disciplined for dishonesty. He received a verbal warning. AGP took no action at this time against Mr. Knutson, nor did it even contact Mr. Knutson to discuss the videotape.

As noted, AGP received the videotape on November 26, 1999. At this time, Mr. Knutson continued on light duty. He ultimately decided to undergo back surgery in order to lift himself out from under the work restrictions. He concluded that, if he did not have surgery, he would be "forever paint brush in hand." Because AGP had denied worker's compensation coverage of his injury, Mr. Knutson was required to use his own health insurance and disability benefits to pay for the surgery. On December 21, 1999, Mr. Knutson went on short-term disability and underwent back surgery.

On March 8, 2000, Mr. Knutson's surgeon released him to return to work with a temporary restriction that he refrain from lifting, carrying, or pushing over 35 pounds more than 25 feet. [Pf.'s exh. 19]. These were essentially the same restrictions Mr. Knutson had prior to going on short-term disability. Mr. Knutson's doctor faxed the release to AGP on March 9, 2000, and Mr. Knutson went to AGP on that day to talk to Mr. Parker about coming back to work. There was no discussion at that time about the videotape or any other potential problems with Mr. Knutson's return to the plant.

Even with the post-surgery restrictions, Mr. Knutson could have performed all the duties of boiler operator that he had performed prior to being assigned to light duty in October of 1999. That is, with the exception of pulling bottom ash and excessive rodding of the stokers, Mr. Knutson's restrictions did not preclude him from rodding the stokers under normal conditions or carrying out the functions of the control room operator. Nevertheless, when Mr. Knutson returned to work on March 13, 2000, Mr. Parker again assigned him light duty work. Specifically, Mr. Knutson reported to the water plant to test samples of purified water, which would later be used in the boilers. He finished out the day without incident and without any indication from Mr. Parker that his job was in jeopardy.

The following day, March 14, 2000, Mr. Parker summoned Mr. Knutson to his office. There, Mr. Parker presented Mr.

Knutson with a letter of termination. The letter stated:

> November 26, 1999 AGP received a videotape, displaying actual footage of an AGP Employee dumping the ash from # 1 and # 2 boilers. Also displayed in this tape is footage of an AGP Employee cleaning a stoker. You made this videotape, without the knowledge or approval of AGP Management.
>
> The act of video taping any part of the AGP operation, within the boundaries of AGP property, without consent of the AGP Chief Executive Officer, or his designate, is in direct violation of AGP Safety Policy, Section I, Item # 7—C. The section reads "AGP's policy does not allow cameras in the plant unless the CEO, or his designate, approves." Plant Work Rule # 17 states that "Violation of safety regulations and practices" is grounds for disciplinary action up to and including suspension and/or termination.
>
> In view of the seriousness of the offense and the breach of security incurred, it is AGP's position that your employment be terminated immediately.

[Deft.'s exh. F].

### 5. The "safety" rule Mr. Knutson allegedly breached

The rule AGP invoked to justify Mr. Knutson's dismissal, Section I, Item # 7—C, is entitled, "OSHA Plant Inspection Procedure." [Pf.'s exh. 21]. OSHA, or the Occupational Safety and Health Administration, is an arm of the United States Department of Labor whose goal is to ensure safe working environments. The preface to Section I of this rule provides:

> Federal and state safety laws allow OSHA Compliance Officers the right to enter, at reasonable times, any company location where work is being performed, for the purpose of making a safety inspection. The OSHA Compliance officer will normally ask to see the plant official that is responsible for plant operations. It is essential that various personnel receive instruction as to their responsibilities, including contacting key personnel about the arrival of the OSHA Compliance Officer.

[Pf.'s exh. 17].

Item 7 applies only to the OSHA compliance officers and outlines what they are authorized to do in performing inspections. Subpart C of the rule provides that, unless compliance officers obtain permission from AGP's chief executive officer, they are not permitted to take photographs. [Pf.'s exh. 17]. If approval to take photographs is obtained, the rule instructs the AGP representative accompanying the officers on their inspection to take duplicate photographs. [Pf.'s exh. 17]. Moreover, if compliance officers intend to take photographs in hazardous areas of the plant, Item 7 mandates that the camera be "explosion proof." [Pf.'s exh. 17]. The other subparts of Item 7 authorize OSHA compliance officers to take environmental samples, to use appropriate scientific or investigate techniques to record conditions, and to assess plant conditions by interviewing employees in private. [Pf.'s exh. 17].

The work rules that apply to AGP employees are contained in the Employee Handbook. [Deft.'s exh. H]. The handbook does not contain any rule prohibiting the use of cameras or videotape equipment in the plant. And while AGP argued at trial that pictures were a significant breach of security, photographs of AGP's Eagle Grove plant had appeared in the Eagle Grove newspaper. Moreover, Mr. Parker testified at trial and in his deposition that, if an employee were to request permission to videotape his or her work for medical purposes, AGP corporate headquarters would likely allow the employee to do so. Even so, AGP sought to estab-

lish at trial that it terminated Mr. Knutson because he made an unauthorized videotape that violated the company's safety rules and was a breach of security. Mr. Parker steadfastly asserted that the videotape was AGP's only consideration in making the termination decision.

## II. LEGAL ANALYSIS

### A. Motion for Judgment as a Matter of Law

#### 1. Applicable standards

The standards for a motion for judgment as a matter of law are outlined in Rule 50 of the Federal Rules of Civil Procedure. In pertinent part, Rule 50 provides:

> **(a) Judgment as a Matter of Law.**
>
> **(1)** If during the trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.
>
> **(2)** Motions for judgment as a matter of law may be made at any time before the submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.
>
> **(b) Renewing Motion for Judgment After Trial.** Alternative Motion for New Trial. If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:
>
> **(1)** if a verdict was returned:
>
> **(A)** allow the judgment to stand,
>
> **(B)** order a new trial, or
>
> **(C)** direct entry of judgment as a matter of law; or
>
> **(2)** if no verdict was returned;
>
> **(A)** order a new trial, or
>
> **(B)** direct entry of judgment as a matter of law.

FED R. CIV. P. 50(a)-(b).

"Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving party." *Manus v. American Airlines, Inc.*, 314 F.3d 968, 972 (8th Cir.2003) (quoting *Belk v. City of Eldon*, 228 F.3d 872, 877–78 (8th Cir.2000) (citation omitted by *Manus* court), *cert. denied*, 532 U.S. 1008, 121 S.Ct. 1734, 149 L.Ed.2d 659 (2001)). The Eighth Circuit Court of Appeals reiterated the standards to be applied by the district court—as well as the appellate court—in determining a motion for judgment as a matter of law:

> When the motion seeks judgment on the ground of insufficiency of the evidence, the question is a legal one. *Hathaway v. Runyon*, 132 F.3d 1214, 1220 (8th Cir.1997); *Jarvis v. Sauer Sundstrand Co.*, 116 F.3d 321, 324 (8th Cir.1997). A jury verdict must be affirmed " 'unless, viewing the evidence in the light most favorable to the prevailing party, we conclude that a reasonable jury could have not found for that party.' " *Stockmen's Livestock Mkt., Inc. [v. Norwest Bank of Sioux City]*, 135 F.3d 1236,

1240–41 (8th Cir.1998) (quoting *Chicago Title Ins. Co. v. Resolution Trust Corp.,* 53 F.3d 899, 904 (8th Cir.1995)).

*Cross v. Cleaver,* 142 F.3d 1059, 1066 (8th Cir.1998); *accord Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 135, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (stating that under Rule 50, a court should render judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.") (citations omitted). Thus, this standard requires the court to:

> "[C]onsider the evidence in the light most favorable to the prevailing party, assume that the jury resolved all conflicts of evidence in favor of that party, assume as true all facts which the prevailing party's evidence tended to prove, give the prevailing party the benefit of all favorable inferences which may reasonably be drawn from the facts, and deny the motion, if in light of the foregoing, reasonable jurors could differ as to the conclusion that could be drawn from the evidence."

*Minneapolis Cmty. Dev. Agency v. Lake Calhoun Assocs.,* 928 F.2d 299, 301 (8th Cir.1991) (quoting *Atlas Pile Driving Co. v. DiCon Fin. Co.,* 886 F.2d 986, 989 (8th Cir.1989)); *see also Stephens v. Johnson,* 83 F.3d 198, 200 (8th Cir.1996) (citing *Whitnack v. Douglas County,* 16 F.3d 954, 956 (8th Cir.1994), in turn, quoting *Hastings v. Boston Mut. Life Ins. Co.,* 975 F.2d 506, 509 (8th Cir.1992)); *Haynes v. Bee–Line Trucking Co.,* 80 F.3d 1235, 1238 (8th Cir.1996); *Nelson v. Boatmen's Bancshares, Inc.,* 26 F.3d 796, 800 (8th Cir. 1994) (reiterating these factors, citing *White v. Pence,* 961 F.2d 776, 779 (8th Cir.1992); *McAnally v. Gildersleeve,* 16 F.3d 1493, 1500 (8th Cir.1994) (same)).

■ In short, a court entertaining a motion for judgment as a matter of law must review all of the evidence in the record but, in doing so, "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves,* 530 U.S. at 150, 120 S.Ct. 2097 (citing *Lytle v. Household Mfg., Inc.,* 494 U.S. 545, 554–55, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 696 n. 6, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962)). This standard for consideration of a motion for judgment as a matter of law accords the jury's verdict substantial deference. *Tilson v. Forrest City Police Dep't,* 28 F.3d 802, 806 (8th Cir.1994); *McAnally,* 16 F.3d at 1500. However, even with this deference to the jury's verdict, the jury cannot be accorded "the benefit of unreasonable inferences, or those 'at war with the undisputed facts,' " *McAnally,* 16 F.3d at 1500 (quoting *City of Omaha Employees Betterment Ass'n v. City of Omaha,* 883 F.2d 650, 651 (8th Cir.1989), in turn, quoting *Marcoux v. Van ·Wyk,* 572 F.2d 651, 653 (8th Cir.1978)). " 'While [the court] [is] compelled to accord the utmost respect to jury verdicts and tread gingerly in reviewing them, [the court] [is] not a rubber stamp convened merely to endorse the conclusions of the jury, but rather [has] a duty to reverse the jury verdict if the evidence cannot support it.' " *Ocheltree v. Scollon Productions, Inc.,* 308 F.3d 351, 355 (4th Cir.2002) (quoting *Price v. City of Charlotte, N.C.,* 93 F.3d 1241, 1250 (4th Cir.1996) (internal citations omitted)), *rehearing en banc granted, opinion vacated on other grounds* (Dec. 16, 2002). Nevertheless, the court must still defer to the jury's resolution of conflicting testimony. *Jackson v. Virginia,* 443 U.S. 307, 326, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Having reviewed the applicable standards, the court turns to an examination of the arguments raised in AGP's motion for judgment as a matter of law to determine whether post-trial relief from the jury's verdict against AGP is appropriate.

## 2. Sufficiency of the evidence—disability discrimination

The ADA provides that "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132.

■ AGP contends that Mr. Knutson failed to establish a *prima facie* case of disability discrimination under the ADA and the ICRA's parallel anti-discrimination provision.[2] Specifically, AGP argues that Mr. Knutson was not perceived as disabled; that Mr. Knutson failed to prove that he was regarded as disabled in the major life activity of working; that Mr. Knutson could not perform the essential functions of the job; and that AGP was not improperly motivated when it made the

decision to terminate Mr. Knutson's employment.

### a. Perceived disability claim: Essential elements

■ The ADA prohibits employers from discriminating against qualified individuals who are disabled because of a disability. 42 U.S.C. § 12112(a). To prove a claim under the ADA, Mr. Knutson must show by a preponderance of the evidence (1) that he is disabled within the meaning of the ADA, (2) that he is qualified, with or without accommodation, to perform the essential functions of the job, and (3) that AGP discharged him because of his disability. *E.g., Fenney v. Dakota, Minnesota & E.R. Co.*, 327 F.3d 707, 711 (8th Cir.2003) (outlining *prima facie* case of disability discrimination) (citing *Duty v. Norton–Alcoa Proppants*, 293 F.3d 481, 490 (8th Cir. 2002)); *Dropinski v. Douglas County, Neb.*, 298 F.3d 704, 706 (8th Cir.2002) (same) (citing *Greer v. Emerson Elec. Co.*, 185 F.3d 917, 921 (8th Cir.1999); *Cooper v. Olin Corp., Winchester Div.*, 246 F.3d 1083, 1087 (8th Cir.2001) (same)) (citing *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir.1999) (en banc)); *Heas-*

---

**2.** The court notes that in considering Mr. Knutson's disability discrimination claims it will not distinguish between his claims under the ADA and comparable disability discrimination claims under the IRCA. This is appropriate because the Iowa Supreme Court has recognized that federal precedent is applicable to discrimination claims under the ICRA. *See Fuller v. Iowa Dep't of Human Servs.*, 576 N.W.2d 324, 329 (Iowa 1998) (recognizing that Chapter 216's prohibition on disability discrimination is the state-law "counterpart" to the ADA, and that, "[i]n considering a disability discrimination claim brought under Iowa Code chapter 216, we look to the ADA and cases interpreting its language. We also consider the underlying federal regulations established by the Equal Employment Opportunity Commission (hereinafter 'EEOC'), the agency responsible for enforcing the ADA.") (internal citations omitted); *cf. Vivian v.*

*Madison*, 601 N.W.2d 872, 873 (Iowa 1999) ("The ICRA was modeled after Title VII of the United States Civil Rights Act"). Iowa courts, therefore, traditionally turn to federal law for guidance in evaluating the ICRA. *King v. Iowa Civil Rights Comm'n*, 334 N.W.2d 598, 601 (Iowa 1983). While federal law is not controlling and courts should not substitute the language of the federal statutes for the clear words of the ICRA, Iowa courts do look to the analytical framework utilized by the federal courts in assessing federal law. *Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989); *accord Board of Supervisors of Buchanan County v. Iowa Civil Rights Comm'n*, 584 N.W.2d 252, 256 (Iowa 1998) ("In deciding gender discrimination disputes, we adhere to the Title VII analytical framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668, 677–79 (1973).").

*er v. Toro Co.,* 247 F.3d 826, 830 (8th Cir.2001) (same); *Maziarka v. Mills Fleet Farm, Inc.,* 245 F.3d 675, 678 (8th Cir. 2001) (same); *Taylor v. Nimock's Oil Co.,* 214 F.3d 957, 959–60 (8th Cir.2000) (same); *Treanor v. MCI Telecomm. Corp.,* 200 F.3d 570, 574 (8th Cir.2000) (same); *Cravens v. Blue Cross & Blue Shield,* 214 F.3d 1011, 1016 (8th Cir.2000) (same); *Browning v. Liberty Mut. Ins. Co.,* 178 F.3d 1043, 1047 (8th Cir.1999) (same). AGP claims that Mr. Knutson failed to establish each of these elements.

### b. Element 1: Disability

■ The ADA defines "disability" in three discrete ways: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Mr. Knutson proceeded to trial under the theory that he falls under the protective umbrella of the ADA by virtue of being "regarded as" or "perceived" as disabled by AGP within the meaning of subpart C of the Act. That is to say that "[a] person may be disabled under the ADA if, notwithstanding the absence of an actual disability, he is perceived or 'regarded as' having an impairment that substantially limits a major life activity." *Weber v. Strippit, Inc.,* 186 F.3d 907, 914 (8th Cir.1999) (citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)). By including individuals who are regarded as disabled within the ambit of the ADA, Congress intended to combat the effects of stereotypes that "work to the disadvantage of persons with or regarded as having disabilities." *Wooten v. Farmland Foods,* 58 F.3d 382, 385 (8th Cir.1995). As this court explained in *Simonson v. Trinity Regional Health System,* 221 F.Supp.2d 982 (N.D.Iowa 2002), *aff'd,* 336 F.3d 706 (8th Cir.2003), in "regarded as" actions,

it is not a question of whether the defendants treated the plaintiff adversely "because of his or her feelings about the plaintiff's physical or mental impairment," *Weber v. Strippit, Inc.,* 186 F.3d 907, 915 (8th Cir.1999), but a question of whether the defendants' treatment of the plaintiff was a result of the defendants' harboring " 'archaic attitudes,' erroneous perceptions, and myths that work to the disadvantage of persons with or regarded as having disabilities." *Brunko v. Mercy Hosp.,* 260 F.3d 939, 942 (8th Cir.2001).

*Simonson,* 221 F.Supp.2d at 990.

To survive this motion for judgment as a matter of law, Mr. Knutson would have to have produced sufficient evidence that would allow a reasonable jury to conclude that AGP either (1) mistakenly believed that Mr. Knutson had a physical impairment that substantially limited one or more major life activities, or (2) mistakenly believed that an actual, though nonlimiting, impairment substantially limited one or more of his major life activities. *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *accord Brunko v. Mercy Hosp.,* 260 F.3d 939, 942 (8th Cir.2001) (citing *Sutton,* 527 U.S. at 489, 119 S.Ct. 2139).

Here, AGP claims that it did not mistakenly perceive Mr. Knutson as having physical impairments that substantially limited him in the major life activity of working. Instead, it argues that all of its perceptions of his impairments were exactly as described by Mr. Knutson's physicians. Thus, the thrust of AGP's argument in this motion is that it did not misperceive Mr. Knutson's working restrictions and that it did not mistakenly believe he was actually disabled when the impairments were not so limiting. [AGP Br., at 6; Doc. No. 65].

Mr. Knutson presented his case to the jury under the *Sutton* Court's second al-

ternative of proving a "regarded as" claim: "covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *See Sutton,* 527 U.S. at 489, 119 S.Ct. 2139. That is, he alleged that AGP mistakenly believed that he had a substantially limiting impairment, when in fact he did not.

In this case, there is no question that Mr. Knutson labored under a series of work restrictions related to various physical ailments, including a permanent restriction concerning his left arm. By way of review of Mr. Knutson's work restrictions and communication with Mr. Knutson, AGP was aware of these impairments. AGP claims that it did not misperceive any of his impairments but instead relied on Mr. Knutson's physicians' written restrictions. The evidence, however, belies this assertion and, in fact, strongly supports the jury's conclusion that AGP viewed Mr. Knutson as having suffered from an impairment that had a considerable and substantial impact that rendered him unable to perform a broad category of factory jobs by perceiving him to be incapable of performing all but the lightest duty of work.

As this court held in its ruling on the defendant's motion for summary judgment, Mr. Knutson's lifting restrictions did not rise to the level of an "actual disability." For the most part, his restrictions on lifting were temporary and otherwise did not substantially limit him in any major life activity. However, Mr. Knutson's restriction that no work be performed with his left arm was permanent. While AGP claims that its perceptions of Mr. Knutson's limitations were based entirely on his written doctors' restrictions and that it did not perceive him to be unable to perform any jobs other than the boiler operator position, the jury heard evidence that AGP perceived that Mr. Knutson could not perform anything more than "makeshift" jobs.

That is to say that the plaintiff produced evidence that, if believed, would have allowed a reasonable jury to conclude that AGP regarded Mr. Knutson's impairments as substantially limiting him in the major life activity of working.

AGP somewhat ingeniously argues that, because this court found on its motion for summary judgment that Mr. Knutson failed to establish that his lifting restrictions rose to the level of an actual disability that it did not regard him as disabled because "[b]eing regarded as having a limiting but not disabling restriction [ ] cannot be a disability within the meaning of the ADA." *Conant v. City of Hibbing,* 271 F.3d 782, 785 (8th Cir.2001). The Court of Appeals for the Eighth Circuit recently applied this holding in *Simonson v. Trinity Regional Health System,* 336 F.3d 706 (8th Cir.2003). In *Simonson,* the plaintiff did not labor under any work restrictions, temporary or permanent, at the time she was discharged. *Id.* at 708–09. She had suffered a number of work-related accidents throughout her tenure with the defendant, but each of her resulting restrictions were temporary and had expired by the time she was terminated. *Id.* In affirming this court's grant of summary judgment in favor of the employer, the *Simonson* court held that "Trinity's awareness of Simonson's past medical problems does not establish that it regarded her as disabled." *Id.* at 709. In *Simonson,* the only evidence that the employer-hospital perceived the plaintiff as disabled, other than its knowledge of her medical history, was a stray comment from a supervising employee, which did not demonstrate an "archaic attitude" but rather merely recognized that the plaintiff's physical condition made her less than ideally suited for other jobs at the hospital. *Id.* (citing *Sutton,* 527 U.S. at 490–91, 119 S.Ct. 2139).

Mr. Knutson's case is easily distinguishable from *Simonson.* He labored under

restrictions at the time of his termination, both temporary and permanent, and a rational juror could have concluded from the evidence that AGP did not regard him as simply having a limiting but not disabling impairment, based upon his doctor's written work restrictions. Instead, the jury could reasonably have concluded that AGP disregarded those non-disabling physical restrictions and imposed its own perception of Mr. Knutson's impairments on its formulation of their effect on his ability to work. In short, Mr. Knutson did not have a substantially limiting impairment, but the evidence, including Mr. Brown's comment, Mr. Brown's angry demeanor when dealing with Mr. Knutson's restrictions, and the jobs to which AGP assigned him in the face of his doctors' restrictions, showed that AGP perceived him to have a substantially limiting impairment.

Moreover, in *Simonson*, the stray comment relied upon by the plaintiff to show that her employer perceived her as substantially limited in the major life activity of working was narrowly tailored to specific jobs within the hospital. *Id.* In Mr. Knutson's case, Mr. Brown made a much broader comment concerning Mr. Knutson's physical limitations, which will be discussed in greater detail below. It suffices to say at this point, however, that the comment did not evince a careful consideration of whether or not Mr. Knutson's physical condition made him suitable for any particular jobs at AGP.

■ While the Supreme Court has not been called upon to rule on the question of whether or not working is a major life activity within the meaning of the ADA, the ADA's regulations and Eighth Circuit case-law strongly support the conclusion that working is a major life activity. *See*

*Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 200, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) ("Because of the conceptual difficulties inherent in the argument that working could be a major life activity, we have been hesitant to hold as much, and we need not decide this difficult question today."); *accord Orr v. Wal–Mart Stores, Inc.*, 297 F.3d 720, 726 n. 7 (8th Cir.2002) (Lay, J., dissenting) ("It is much too late in the day in this circuit to hold that working may not be one of the major life activities under the ADA.") (citing *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 954–55 (8th Cir. 1999); *Helfter v. United Parcel Serv., Inc.*, 115 F.3d 613, 617 (8th Cir.1997)); *Kellogg v. Union Pac. R.R.*, 233 F.3d 1083, 1087 (8th Cir.2000) (assuming, without deciding, that working is a major life activity under the ADA) (citing *Sutton*, 527 U.S. at 492, 119 S.Ct. 2139 (same)); 29 C.F.R. § 1630.2(i) (Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."). AGP assumes that working qualifies as a major life activity, and this court, like so many others, concludes that it does.

Here, to sustain the jury's verdict, the plaintiff must have presented sufficient evidence proving that AGP mistakenly perceived him to be substantially limited in the major life activity of working. In order to make this determination, the court must briefly explore what it means to be substantially limited in the major life activity of working.

■ *i. Substantially limited in major life activity of working, generally.* The ADA's "substantially limits" requirement indicates that an impairment must interfere with a major life activity " 'considerabl[y]' or 'to a large degree.' " [3] *Toyo-*

---

**3.** The *Toyota* decision and its analysis concerning the ADA's requirement that a disability "substantially limit" a major life activity

specifically addressed the major life activity of performing manual tasks. However, the Eighth Circuit has held "that *Toyota's* analy-

*ta*, 534 U.S. at 200, 122 S.Ct. 681. The Supreme Court has commented:

> When referring to the major life activity of working, the EEOC defines "substantially limits" as: "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and ability."

*Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 523, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999) (quoting 29 C.F.R. § 1630.2(j)(3)(i) (1998)); *accord Fjellestad*, 188 F.3d at 949 ("A person is substantially limited in working if she [or he] is 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities.'") (quoting *Doane v. City of Omaha*, 115 F.3d 624, 627 (8th Cir.1997)).

■ The regulations direct district courts to consider factors, such as the number and type of jobs from which the impaired individual is disqualified; the geographical area to which the individual has reasonable access; and the individual's job training, experience, and expectations, in order to determine whether a person is substantially limited in the major life activity of working.[4] 29 C.F.R. § 1630.2(j)(3)(ii); *accord Fjellestad*, 188 F.3d at 949 (listing above factors); *Helfter v. United Parcel Serv., Inc.*, 115 F.3d 613, 617 (8th Cir.1997) (same).

■ Like other major life activities, the determination of whether an individual is substantially limited in working must be made on a case-by-case basis. *Fjellestad*, 188 F.3d at 949 (personalized inquiry); *Webb v. Garelick Mfg. Co.*, 94 F.3d 484, 488 (8th Cir.1996) (same). In *Webb v. Garelick Manufacturing Co.*, the Eighth Circuit Court of Appeals explained that "[a] court must ask 'whether the particular impairment constitutes for the particular person a significant barrier to employment.'" *Webb*, 94 F.3d at 488. Pertinent to defining the class of jobs used to determine disability are the person's expertise, background, and job expectations. *Id.* "Finding that an individual is substantially limited in his or her ability to work requires a showing that his or her overall employment opportunities are limited." *Fjellestad*, 188 F.3d at 949 (citing *Miller v. City of Springfield*, 146 F.3d 612, 614 (8th Cir.1998)); *accord E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 815 (8th Cir.2001) ("In order to find that an individual is substantially limited in working, there must be a showing that his or her overall employment opportunities are limited.") (citing *Fjellestad*, 188 F.3d at 949); *Miller v. City of Springfield*, 146 F.3d 612, 614 (8th Cir. 1998) (same).

The Supreme Court recently addressed a disability claimant's burden under the ADA:

> It is insufficient for individuals attempting to prove disability status under this test [of actual disability] to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those "claiming the Act's protection ... to prove a disability by offering evidence that the extent of the limitation [caused

---

sis applies no matter the specific class of major life activity one is claiming." *Fenney v. Dakota, Minnesota & Eastern R. Co.*, 327 F.3d 707, 715 (8th Cir.2003).

**4.** The EEOC's interpretive guidelines are not controlling but do "constitute a body of expe-

rience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

by their impairment] in terms of their own experience . . . is substantial."

*Toyota Motor,* 122 S.Ct. at 691–92 (quoting *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 567, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999)) (alterations provided by *Toyota Motor* Court).

In *Toyota Motor,* the Court emphasized the need to perform an individualized assessment of a person's physical impairment to determine whether that impairment substantially limits the major life activities of that particular person. *See id.,* 122 S.Ct. at 692. The Court reasoned that medical diagnoses alone are insufficient to qualify a person as disabled within the meaning of subsection A (actual disability) of the ADA because symptoms vary in degree and extent from person to person. *Id.* In *Toyota Motor,* the respondent suffered from carpal tunnel. *Id.* The Court noted the following:

> An individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person. Carpal tunnel syndrome, one of respondent's impairments, is just such a condition. While cases of severe carpal tunnel syndrome are characterized by muscle atrophy and extreme sensory deficits, mild cases generally do not have either of these effects and create only intermittent symptoms of numbness and tingling. Studies have further shown that, even without surgical treatment, one quarter of carpal tunnel cases resolve in one month, but that in 22 percent of cases, symptoms last for eight years or longer. When pregnancy is the cause of carpal tunnel syndrome, in contrast, the symptoms normally resolve within two weeks of delivery. Given these large potential differences in the severity and duration of the effects of carpal tunnel syndrome, an individual's carpal tunnel syndrome diagnosis, on its own, does not indicate whether the

individual has a disability within the meaning of the ADA.

*Id.* Of course, Mr. Knutson did not argue at trial that he indeed was substantially limited in the major life activity of working, but these standards are relevant because he must prove that AGP regarded him to be "substantially limited" within the meaning of the ADA.

**▮ ii. Did Mr. Knutson produce sufficient evidence that AGP regarded him as disabled?** On this motion for judgment as a matter of law, AGP repeatedly argues that it merely perceived Mr. Knutson's impairments as precluding his ability to be a boiler operator (based on his physicians' restrictions) and that there is no evidence to support Mr. Knutson's contention that AGP perceived Mr. Knutson as having substantially limiting impairments. In support of this argument, AGP points to the fact that, until October 7, 1999, AGP employed Mr. Knutson as a boiler operator and only reassigned him after he complained that rodding the stokers was causing him pain.

However, at trial, Mr. Brown, who was Mr. Knutson's direct supervisor, testified that he perceived that Mr. Knutson's physical condition was worsening. AGP's response to Mr. Knutson's log book comment is evidence of that perception. In the log book, Mr. Knutson did not complain that he was working outside his restrictions, as AGP contends, but that the excessive rodding was painful. Seeing this, AGP immediately required Mr. Knutson to visit a physician to get restrictions. The jury also heard evidence that another boiler operator complained of physical pain from the excessive rodding on October 7, 1999. Still, AGP did not send this employee to a doctor, nor did it even discuss the log book comment with that operator.

Moreover, none of Mr. Knutson's restrictions precluded him from performing

the duties associated with the boiler operator position. Mr. Knutson personally stated he preferred not to pull bottom ash because it caused him pain, but the restrictions were not so limiting. Despite the fact Mr. Knutson's physical condition had not changed since before the time he made the log book notations, and despite the fact he could still perform his duties even with the October 18, 1999 restrictions, AGP assigned Mr. Knutson to light duty work. This work involved almost no physical activity and certainly less physical labor than Mr. Knutson had been performing as a boiler operator.

■ Mr. Brown verbalized AGP's mistaken belief that Mr. Knutson's impairments substantially limited him in his ability to work. Specifically, he told Mr. Knutson that he was not to operate any equipment at AGP, nor even to touch a button. The perception that this statement embodies is further seen in the type of work Mr. Knutson was assigned even though he was capable of performing the boiler operator duties—holding a hose and painting pipes. "A person is regarded as having ... [a substantially limiting] impairment if others treat [him] as if [he] is disabled." *Cody v. CIGNA Healthcare of St. Louis, Inc.*, 139 F.3d 595, 599 (8th Cir.1998) (citing *Webb v. Mercy Hosp.*, 102 F.3d 958, 960 (8th Cir.1996); *Aucutt v. Six Flags Over Mid–America, Inc.*, 85 F.3d 1311, 1319 (8th Cir.1996)) (quoting 29 C.F.R. § 1630.2(*l*)).

Further, contrary to AGP's assertion, this is not a case like *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002), where the Supreme Court held that the EEOC regulation authorizing an employer's refusal to hire an individual because his performance on the job would endanger his own health owing to a disability did not exceed the scope of permissible rule-making under the ADA. *Id.* at 76, 122 S.Ct. 2045. In that case, the

employer rescinded a job offer because the pre-employment physical examination revealed that the petitioner suffered from hepatitis C and that exposure to chemicals in the employer's plant would aggravate his condition. *Id.* at 76–77, 122 S.Ct. 2045. The Court held that the employer was entitled to reasonably rely on the doctors' advice regarding the petitioner's well-being in rescinding its offer of employment. *Id.* at 77, 122 S.Ct. 2045.

The main distinction between *Echazabal* and Mr. Knutson's case is that the evidence in Mr. Knutson's case, if believed, showed that AGP did not rely on Mr. Knutson's medical restrictions in its perception of the type of work he could safely perform. Instead, it disregarded Mr. Knutson's medical restrictions, which would have allowed him to continue as boiler operator. The court instructed the jury that "an employer does not perceive an employee to be disabled if the employer's conclusion that the employee is unable to perform either a class of jobs or a broad range of jobs in various classes is a reasonable one based upon an individualized inquiry that takes into account medical or other evidence concerning the employee's actual ability to perform a class of jobs or a broad range of jobs in various classes." [Final Jury Instruction No. 3, at 20].

The jury evidently concluded that AGP did not make an individualized assessment of Mr. Knutson's ability to work. Instead, relying on stereotypes and Mr. Brown's unsubstantiated belief that Mr. Knutson's condition was deteriorating, AGP assigned Mr. Knutson to makeshift work around the plant and told him that he could not operate any equipment at AGP, even if it was as simple as pushing a button. By assigning Mr. Knutson to work well below the threshold physical requirements that his work restrictions permitted him to do and by taking him out of the boiler position,

which was within his restrictions, AGP's actions demonstrate that it perceived Mr. Knutson's impairments to be substantially limiting.

■ AGP rightly points out that reliance on physicians' assessments and restriction is not evidence that an employer has a mistaken belief or perception concerning an employee's condition. *See Alexander v. Northland Inn,* 321 F.3d 723, 727 (8th Cir.2003) ("Northland was entitled to rely and act upon the written advice from [the plaintiff's] physician that unambiguously and permanently restricted her from [performing an essential function of her job]."); *Cody,* 139 F.3d at 599. However, again, AGP did not rely on Mr. Knutson's physicians' assessments in assigning the plaintiff to extra-light duty work. Indeed, it is undisputed that Mr. Knutson's restrictions did not preclude him from performing any of the boiler operator's duties, much less restrict him from touching a button or operating any equipment. The jury heard evidence that AGP not only regarded Mr. Knutson as unable to perform the job of boiler operator, as it contends, but the job of operating any equipment or even touching a button. Further, because Mr. Knutson was, in fact, capable of performing the boiler operator position, the jury was entitled to conclude that AGP regarded the plaintiff as disabled.

### c. Element 2: Qualified individual

■ The inquiry into whether an employee is a "qualified individual" within the meaning of the ADA has two prongs: the individual must (1) possess the requisite skill, education, experience, and training for the position; and (2) be able to perform the essential job functions, with or without reasonable accommodation. 42 U.S.C. § 12111(8); *Heaser v. Toro Co.,* 247 F.3d 826, 830 (8th Cir.2001); *Weber v. Strippit, Inc.,* 186 F.3d 907, 915 (8th Cir. 1999); *Moritz v. Frontier Airlines, Inc.,*

147 F.3d 784, 786–87 (8th Cir.1998); 29 C.F.R. § 1630.2(m). In this case, only the second prong is in dispute. That is, whether or not Mr. Knutson could perform the essential functions of the boiler operator position with or without reasonable accommodation.

Here, the duties of a boiler operator, generally, include maintaining and overseeing the control room, rodding the stokers, and pulling bottom ash. The parties agree that Mr. Knutson could perform all the control room operator duties. Further, the jury heard substantial evidence that Mr. Knutson could rod the stokers without assistance and that his medical restrictions did not preclude him from doing so except during times when the boiler was not operating properly, such as on October 6th and 7th of 1999. However, the evidence also showed that, regardless of whether Mr. Knutson could rod the stokers, AGP sometimes assigned another employee to perform the task. And while his restrictions also permitted him to pull bottom ash, Mr. Knutson admittedly refused to perform this function of the job. Thus, the fighting issue on this element of Mr. Knutson's ADA claim centers on whether pulling bottom ash and rodding the stokers are essential functions of the boiler operator position.

■ ***i. Defining essential functions, generally.*** "An essential function 'means the fundamental job duties of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the marginal functions of the position.' " *Moritz,* 147 F.3d at 787 (quoting 29 C.F.R. § 1630.2(n)(1)). "Although an ADA plaintiff retains the ultimate burden of proving that he is a qualified individual, an employer who disputes the plaintiff's claim he can perform the essential functions must put forth evidence establishing those func-

tions." *Maziarka v. Mills Fleet Farm, Inc.*, 245 F.3d 675, 680 (8th Cir.2001) (citing *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1113 (8th Cir.1995)). In *Moritz v. Frontier Airlines, Inc.*, 147 F.3d 784 (8th Cir.1998), the Eighth Circuit Court of Appeals stated that an essential function may be established by evidence of the following:

> (1) "[t]he employer's judgment as to which functions are essential"; (2) "[w]ritten job descriptions prepared before advertising or interviewing applicants for the job"; (3) "the amount of time spent on the job performing the function"; (4) "the consequences of not requiring the incumbent to perform the function"; and (5) "the current work experience of incumbents in similar jobs."

*Id.* at 787 (quoting 29 C.F.R. § 1630.2(n)(3)). Moreover, the regulations interpreting the ADA provide:

> A job function may be considered essential for any of several reasons, including but not limited to the following:
>
> (i) The function may be essential because the reason the position exists is to perform that function;
>
> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
>
> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

29 C.F.R. § 1630.2(n)(2).

■ ***ii. Are pulling bottom ash and rodding the stokers essential functions of the job?*** There is no dispute in this case that pulling bottom ash and rodding the stokers are ordinary functions of the boiler operator position. Whether or not they are essential functions was hotly con-

tested at trial, with both parties presenting evidence in support of their respective positions. The jury apparently chose to believe Mr. Knutson's contention that these tasks are not essential functions, and the court cannot say that this conclusion was unreasonable or unsupported by the evidence.

■ Whether or not a function is essential is a fact-specific inquiry. 29 C.F.R. § 1630.2(n); *see also Hall v. United States Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988) ("[T]he determination of whether physical qualifications are essential functions of a job requires the court to engage in a highly *fact-specific* inquiry."). "Such a determination should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved." *Hall*, 857 F.2d at 1079. In this case, consideration of the regulation's factors do not support a finding that pulling bottom ash and rodding the stokers are essential functions of the boiler operator position when the evidence is viewed in the light most favorable to the plaintiff. *See* 29 C.F.R. § 1630.2(n)(2) (listing factors). First, pulling bottom ash need only be done two or three times in a 12–hour shift. Furthermore, the task can be completed in only about 15 minutes. Rodding the stokers, likewise, is a relatively minor task. The stokers are generally checked once per 12–hour shift, and rodding them takes approximately 30 minutes. In total, these tasks generally consume 1/12 of a boiler operator's work shift. The tasks are "proportionately so insignificant that [they] cannot be considered as ... essential function[s] of [the boiler operator] position." *Ackerman v. Western Elec. Co.*, 643 F.Supp. 836, 846 (N.D.Cal.1986), *aff'd*, 860 F.2d 1514 (9th Cir.1988) (74% of plaintiff's time was spent on basic and complex wiring, which posed no risk to her, and

only 9% and 2.5% were spent on cabling and iron work, respectively.). In addition, neither pulling bottom ash nor rodding the stokers requires any specialized training, though the control room operator function does.

And while some of the factors identified by the Eighth Circuit weigh in favor of a finding that pulling bottom ash and rodding the stokers are essential functions, no one factor is dispositive. *See Coleman v. Keebler Co.,* 997 F.Supp. 1102, 1115 (N.D.Ind.1998). For example, it is undisputed that other boiler operators ordinarily perform these tasks, but the position does not exist for these tasks, they involve minimal time commitments, and another employee is always readily available to perform them without disruption to his or her job. With this in mind, the jury could have reasonably concluded that, while pulling bottom ash and rodding the stokers are tasks normally assigned to boiler operators, they are marginal tasks that need not exclusively be performed by the boiler operator.

In *Summerville v. Trans World Airlines, Inc.,* 219 F.3d 855 (8th Cir.2000), the Court of Appeals for the Eighth Circuit held that the ability to lift disabled passengers and luggage was an essential function of the customer service position. Because it was undisputed that the plaintiff could not perform this task, the *Summerville* court reversed the trial court's denial of the defendant's motion for judgment as a matter of law. *Id.* at 858–59. In support of his contention that lifting was not an essential function, the plaintiff presented evidence that customer service agents in actuality performed very little lifting and, when lifting was required, other employees were regularly available to perform the task in the plaintiff's stead. *Id.* at 858.

The defendant, however, countered that it viewed lifting baggage and wheelchair-bound passengers as essential functions of the customer service agent position and that performing those duties was required by the collective bargaining agreement. *Id.* The court reasoned that limited staffing was a problematic issue on the shifts that the plaintiff wished to work, which is precisely why the defendant bargained for a provision in the collective bargaining agreement precluding limited duty employees, such as the plaintiff, from serving as customer service agents on those particular shifts. *Id.* at 859.

AGP, likewise, argues that the fact it runs a "skeleton crew" on nights and weekends makes pulling bottom ash and rodding the stokers essential functions because of the limited number of employees available to perform these tasks on those shifts. Mr. Knutson's case, however, is easily distinguishable from *Summerville*. First, Mr. Knutson testified that he and Mr. Askvig always worked the same shift; thus, the jury could have concluded based on the evidence presented that Mr. Askvig was always available to pull ash for Mr. Knutson.

More telling on this issue, however, is the fact that someone must be in the control room at all times, even when ash is being pulled or the stokers are being rodded. Mr. Parker and Mr. Brown both testified to this effect. Therefore, a single boiler operator cannot pull ash, rod the stokers, *and* supervise the control room. In fact, the evidence showed that pulling bottom ash without someone supervising the gauges in the control room would pose a serious threat to the safety of the individual pulling ash.

■ "Physical criteria, such as the ability to lift heavy loads, are properly considered 'essential functions' only if they are 'necessarily and substantially related to a person's ability to perform ... the job.'" *Coleman,* 997 F.Supp. at 1115 (quoting *Rios v. Indiana Bayer Corp.,* 965

F.Supp. 919, 922 (S.D.Tex.1997)). Here, pulling ash actually detracts from a boiler operator's primary function of supervising the control room. A jury could reasonably have concluded that another employee is always available to pull bottom ash and rod the stokers and that supervising the control room is the critical component of the job, thus weighing against a finding that pulling ash and rodding the stokers are essential functions of the boiler operator position.

In addition, the jury also heard evidence that AGP cross-trained at least one employee, Mr. Askvig, to be a turbine operator and to perform certain functions associated with the boiler operator position. He and Mr. Knutson always worked on the same shift. Mr. Lilly was also trained to pull bottom ash and to rod the stokers. That is to say, AGP had trained employees available to perform these marginal tasks. Moreover, the jury rationally could have concluded from Mr. Askvig's testimony that requiring other employees to pull bottom ash and rod the stokers did not disrupt those employees' normal job functions because of the minimal time involved in performing these manual tasks.

In this case, the evidence strongly supports the jury's conclusion that the control room operator function is the critical component of the boiler operator position and that pulling ash and rodding the stokers are marginal, non-essential functions. That AGP had Mr. Askvig or Mr. Lilly perform these functions from March of 1999 until Mr. Knutson was reassigned to light duty in October of 1999 is also probative of the non-essential nature of these tasks. Mr. Knutson's work restrictions that prevented him from pulling ash expired unnoticed by AGP. Moreover, his restrictions did not preclude him from rodding the stokers, and the evidence showed that he usually rodded them himself. The jury could infer from AGP's nonchalant attitude regarding whether or not Mr. Knutson or another operator pulled ash or rodded the stokers that these tasks were not essential to the boiler operator position.

■■■ Employers have an affirmative obligation to make reasonable accommodations for disabled employees. And while "[i]t is well settled that an employer is under no obligation to reallocate the essential functions of a position that a qualified individual must perform," *Moritz,* 147 F.3d at 788, reallocating the marginal functions of a job is oftentimes a reasonable accommodation.[5] *Treanor v. MCI Telecommunications Corp.,* 200 F.3d 570, 575 (8th Cir.2000) (citing *Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108, 1112–13 (8th Cir. 1995)). An accommodation is not reasonable, and will therefore not be required, if, for instance, it imposes an undue hardship upon the operation of the employer.

■■■ The Eighth Circuit has explained, Job restructuring is a possible accommodation under the ADA. *See* 42 U.S.C. § 12111(9)(B); 29 C.F.R.

---

**5.** Indeed, under the circumstances of this case, reallocating these marginal tasks is a reasonable accommodation. The evidence showed reassignment did not create any hardship, and the tasks were easily absorbed by other employees without disruption of their jobs. Nevertheless, "If the claimant proves he or she 'can perform the essential functions of the job,' the qualified person element is met. If not, then an additional inquiry must be made to determine if a 'reasonable accommodation by the employer would enable [the claimant] to perform the essential functions.'" *Casey's General Stores, Inc. v. Blackford,* 661 N.W.2d 515, 520 (Iowa 2003) (internal citations omitted). Because the jury rationally determined that Mr. Knutson could perform the essential functions of the boiler operator position without reasonable accommodation, the "qualified individual" inquiry ends.

§ 1630.2(o)(2)(ii) (1994). Restructuring frequently involves reallocating the marginal functions of a job. EEOC, Technical Assistance Manual at III–21. An employer need not reallocate the essential functions of a job, which a qualified individual must perform. *Hall v. United States Postal Service*, 857 F.2d 1073, 1080 ·(6th Cir.1988); EEOC, Technical Assistance Manual at III–21.

*Benson*, 62 F.3d at 1112–13; *accord Dropinski v. Douglas County, Neb.*, 298 F.3d 704, 709–10 (8th Cir.2002) ("Douglas County is not required to reassign existing workers to assist Dropinski in his essential duties, and it is clear any accommodation would result in just that.") (internal citation omitted); *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 950 (8th Cir.1999) ("While job restructuring is a possible accommodation under the ADA, this court has held that an employer need not reallocate or eliminate the essential functions of a job to accommodate a disabled employee."). The determination of whether or not an accommodation is reasonable, "like the essential function determination, is highly fact-specific and requires the court to engage in an individualized inquiry to ensure that the employer's justifications 'reflect a well-informed judgment grounded in a careful and open-minded weighing of the risks and alternatives. . . .'" *Hall*, 857 F.2d at 1080 (quoting *Arline v. School Bd. of Nassau County*, 772 F.2d 759, 765 (11th Cir.1985), *aff'd*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)).

In this case, because pulling bottom ash and rodding the stokers were ordinary but marginal tasks of the boiler operator, and because reassigning the tasks to other regularly available employees did not disrupt AGP's operations nor cause any hardship to AGP or the employees performing the tasks, the court must conclude that the evidence, when viewed in the light most favorable to Mr. Knutson, supports the jury's finding that pulling bottom ash and rodding the stokers were not essential functions of the job and that restructuring the position to have others perform these marginal tasks was a reasonable accommodation. Therefore, the evidence is sufficient to support the jury's conclusion that Mr. Knutson was a "qualified individual" within the meaning of the ADA.

#### d. Element 3: Causality

 Having found that Mr. Knutson presented sufficient evidence for a reasonable jury to conclude that he established the first two elements of his perceived disability claim, the court turns next to the heart of employment discrimination claims—did the plaintiff prove that he was discharged *because of* his disability, or, in this case, because of the defendant's harboring of "'archaic attitudes,' erroneous perceptions, and myths that work to the disadvantage of persons with or regarded as having disabilities'"? *See Brunko*, 260 F.3d at 942 (quoting *Wooten*, 58 F.3d at 385).

 Under the ADA, a plaintiff establishes the third element of his or her *prima facie* case of disability discrimination if he or she proves "that the employer discharged him [or her] in whole or in part because of his [or her] disability." *Weber v. Strippit, Inc.*, 186 F.3d 907, 912 (8th Cir.1999) (citing *Katz v. City Metal Co.*, 87 F.3d 26, 30 (1st Cir.1996)); *accord Feliciano v. Rhode Island*, 160 F.3d 780, 784 (1st Cir.1998) (same) (citing *Katz*, 87 F.3d at 30). The Eighth Circuit's holding that disability need not be the sole motivating factor is consistent with the recent Supreme Court case, *Desert Palace, Inc. v. Costa*, —— U.S. ——, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). In *Desert Palace*, the Supreme Court held that a Title VII claimant need not present direct evidence of discrimination in order to be entitled to the "mixed-motive" instruction because such evidence is not required in order to

establish liability under 42 U.S.C. § 2000e–2(m).[6] *Id.,* 123 S.Ct. at 2150. In so holding, the Court reasoned, "where … the words of the statute are unambiguous, the 'judicial inquiry is complete.' Section 2000e–m(2) unambiguously states that a plaintiff need only 'demonstrat[e]' that an employer used a forbidden consideration with respect to 'any employment practice.'" *Id.,* 123 S.Ct. at 2153 (internal citations omitted).

In the context of the ADA, the statute similarly does not require that disability discrimination be the sole cause of an adverse employment action. Moreover, the Act itself expressly adopts the procedures set forth in Title VII:

> The powers, remedies, and procedures set forth in sections 2000e–4, 2000e–5, 2000e–6, 2000e–8, and 2000e–9 of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment.

42 U.S.C. § 12117(a); *cf. Skomsky v. Speedway SuperAmerica, L.L.C.,* 267 F.Supp.2d 995, 1000 (D.Minn.2003) ("The interests of uniformity require the Court to extend the burden-shifting paradigm articulated in 42 U.S.C. § 2000e–2(m) and § 2000e–5(2)(B) to ADA disparate treatment claims, including perceived disability claims.").

Mr. Knutson introduced evidence at trial tending to prove that he was transferred to light duty and ultimately discharged because of his perceived disability. AGP claimed that the sole motivating factor in the termination decision, however, was Mr. Knutson's unauthorized videotaping inside of the plant in violation of AGP Safety Policy, Section I, Item # 7—C. The jury's apparent disbelief of this legitimate reason for his termination, coupled with other circumstantial evidence, provided a permissible basis for the trier of fact to infer the ultimate fact of discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The evidence of pretext includes: the evidence that the safety rule invoked by AGP applied only to OSHA compliance officers and not to Mr. Knutson, the fact that Mr. Askvig was not disciplined for participating in the making of the videotape, the fact that Mr. Knutson continued to work for AGP for nearly four months before being contacted about the videotape despite AGP's knowledge that he was responsible for its creation, Mr. Brown's directive to Mr. Knutson instructing him not to touch a button or to operate any equipment at AGP, Mr. Brown's perception that Mr. Knutson's condition was becoming increasingly worse despite the fact his condition had not changed, the fact that none of Mr. Knutson's several work restrictions precluded him from performing the essential functions of the boiler operator position nor the marginal manual labor functions, and the suspect timing of Mr. Knutson's termination one day after returning from surgery.

In *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court discussed the significance of a jury's finding that the employer's stated legitimate reason in a discrimination case is pretextual.[7] Such a finding of falsi-

---

**6.** 42 U.S.C. § 2000e–2(m) provides:

Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

**7.** While *Reeves* is most commonly invoked on the second stage of the *McDonnell Douglas*

ty permits the jury, but does not compel it, to infer the ultimate fact of discrimination. *Id.* at 147, 120 S.Ct. 2097. The Court reiterated its reasoning from a previous discrimination case:

> "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination."

*Id.* (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

The Court went on to explain,

> "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *See id.,* at 517, 113 S.Ct. 2742 ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination"). In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." *Wright v. West,* 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992); see also *Wilson v. United States,* 162 U.S. 613, 620–621, 16 S.Ct. 895, 40 L.Ed. 1090 (1896); 2 J. Wigmore, Evidence § 278(2), p. 133 (J. Chadbourne rev.1979). Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Cf. *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) ("[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with *some* reason, based his decision on an impermissible consideration"). Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

*Reeves,* 530 U.S. at 147–48, 120 S.Ct. 2097.

Here, the evidence strongly suggests that AGP's stated reason for terminating

---

burden-shifting paradigm on motions for summary judgment, its holding concerning the import of a finding of pretext is relevant to this post-trial motion. The Seventh Circuit recently addressed the applicability of the *McDonnell Douglas* burden-shifting approach to Rule 50 motions in employment discrimination cases. In *Millbrook v. IBP, Inc.,* 280 F.3d 1169 (7th Cir.), *cert. denied,* 537 U.S. 884, 123 S.Ct. 117, 154 L.Ed.2d 143 (2002), the court noted that "once a trial is complete and judgment rendered, the burden-shifting framework of *McDonnell Douglas* falls away: 'Post-trial we consider only whether the record supports the resolution of the ultimate question of intentional discrimination.'" *Id.* at 1174 (quoting *Collins v. Kibort,* 143 F.3d 331, 335 (7th Cir.1998)). On a motion for judgment as a matter of law, the question is not whether the employer's proffered reason for its adverse employment action was pretextual, but rather whether sufficient evidence supports the jury's finding that it discriminated against the plaintiff because of an illegitimate reason, of which a finding of pretext is circumstantial evidence. *See Reeves,* 530 U.S. at 147–48, 120 S.Ct. 2097.

Mr. Knutson, *i.e.*, the unauthorized video-tape, was pretextual. First, the evidence viewed in the light most favorable to the plaintiff shows that the rule invoked by AGP, AGP Safety Policy, Section I, Item # 7—C, did not apply to plant-floor workers, such as Mr. Knutson. Instead, the plain language of the rule clearly supports a finding that the "no photographs" policy applied to OSHA compliance officers conducting plant inspections. Contrary to its assertion at trial, AGP had no work rule in effect prohibiting cameras in the workplace without appropriate authorization.

Further, Mr. Knutson was not discharged until nearly four months after AGP discovered that he made the video-tape. This long delay is particularly suspect in light of the fact that AGP immediately confronted Mr. Askvig about his participation in the videotape's making. While it would not be unreasonable to discipline Mr. Askvig and Mr. Knutson differently based on their respective roles in the making of the videotape, the jury could have concluded that AGP's failure to discipline Mr. Askvig entirely for his role demonstrated that AGP did not view the videotape as a dischargeable offense, thus giving rise to an inference that AGP used the videotape justification to cover up a more sinister motive—discrimination. This inference, when coupled with the suspect timing of Mr. Knutson's discharge only one day after being released to return to work after back surgery and AGP's assignment of work well below Mr. Knutson's physicians' restrictions prior to the back surgery, is sufficient to allow a reasonable jury to conclude that AGP's decision to terminate Mr. Knutson was unlawfully motivated by discriminatory animus.

█ In addition, while, as stated, it would not be unreasonable to discipline Mr. Knutson and Mr. Askvig differently under these circumstances, Mr. Parker

testified that he considered Mr. Askvig's involvement in videotaping the plant as violative of the alleged work rule. Therefore, there is evidence in the record from which a reasonable jury could conclude that Mr. Askvig and Mr. Knutson were similarly situated. "An employee can show pretext by showing that the employer meted out more lenient treatment to similarly situated employees who were not in the protected class or did not engage in protected activity." *Salitros v. Chrysler Corp.*, 306 F.3d 562, 570 (8th Cir.2002) (citing *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 727 (8th Cir.2001)). This, too, would support a finding that AGP was "dissembling to cover up a discriminatory purpose." *See Reeves*, 530 U.S. at 147, 120 S.Ct. 2097.

Mr. Knutson's case is similar to *Thomlison v. City of Omaha*, 63 F.3d 786 (8th Cir.1995). *Thomlison* was brought under the Rehabilitation Act of 1973, § 504, *as amended*, 29 U.S.C. § 794, but cases interpreting the Rehabilitation Act are instructive in ADA analyses. *See Wooten v. Farmland Foods*, 58 F.3d 382, 385 n. 2 (8th Cir.1995). In *Thomlison*, the plaintiff was fired from her position as a firefighter ostensibly because she falsified her application for employment by failing to disclose a foot condition. *Thomlison*, 63 F.3d at 788. The plaintiff did not disclose her foot condition nor her ongoing treatment because she did not think it was a "serious medical problem" requiring disclosure. *Id.* at 787.

After suffering two work-related injuries, which were unrelated to her foot condition, the fire department investigated her medical condition in order to determine whether she was still qualified to be a firefighter. *Id.* at 788. It was during the course of this investigation that the fire department discovered she was undergoing treatment for her foot condition. *Id.* The fire department notified the plaintiff

that it was terminating her because of the alleged falsification of the medical exam form. *Id.*

Upholding the jury's verdict while noting the evidence was slim, the *Thomlison* court reasoned, "A strong temporal connection exists between Thomlison's medical condition and the sudden discovery of the alleged falsification. Viewing the evidence in the light most favorable to Thomlison, a jury could rationally infer that the Fire Division began treating Thomlison differently due to a perception about her medical condition." *Id.* at 789.

In Mr. Knutson's case, the jury could rationally infer that AGP's perception of Mr. Knutson's physical limitations changed after October 6th and 7th, which is when AGP began treating him differently by removing him from the boiler operator position. The medical restrictions dated October 13, 1999 and October 18, 1999 did not represent a change from his former medical condition, yet AGP removed him from the boiler operator position and assigned him to light duty work, instructing him not to operate any equipment, regardless of whether or not such operation fit within his restrictions. While AGP claimed that it terminated Mr. Knutson because he violated a work rule, the temporal connection between his returning to work after surgery and his discharge would permit a rational jury to infer discriminatory intent, especially in light of the complete lack of temporal connection between Mr. Knutson's violation of the alleged work rule and his termination.

In sum, the court concludes that, based upon the evidence presented at trial, a reasonable jury could have found that Mr. Knutson was a qualified individual who AGP regarded as disabled and who, with or without reasonable accommodation, could perform the essential functions of his job. Reasonable minds could differ as to the conclusions that could be drawn from the evidence presented at trial, but the court is required to defer to the jury's resolution of conflicting testimony. *See Jackson,* 443 U.S. at 326, 99 S.Ct. 2781. The court will not second guess the jury's credibility determinations, and the evidence, when viewed in the light most favorable to Mr. Knutson, shows that AGP perceived Mr. Knutson as being physically incapable of performing all but the lightest duty of jobs, that supervising the control room was the essential function of the boiler operator position, that Mr. Knutson could perform this function, that pulling bottom ash and rodding the stokers were ordinary yet marginal functions of the boiler operator position, that assigning those tasks to other employees was a reasonable accommodation under the circumstances, and, ultimately, that Mr. Knutson was terminated because of his perceived disability and not because of AGP's purported rule against videotaping within the confines of the plant. Accordingly, the court finds that Mr. Knutson presented sufficient evidence to support each of the essential elements of his perceived disability claim, and, therefore, the defendant's motion for judgment as a matter must be denied.[8]

---

**8.** An employment discrimination defendant may limit the relief available to a plaintiff by showing that "it would have made the same decision, even absent consideration of the impermissible factor." *Doane v. City of Omaha,* 115 F.3d 624, 629 (8th Cir.1997); *e.g.,* 42 U.S.C. § 2000e–5(g)(2)(B)(i), (ii). If "the employer proves that it would have made the same decision absent consideration of the employee's disability, the remedies available are limited to a declaratory judgment, an injunction that does not include an order for reinstatement or for back pay, and some attorney's fees and costs." *Pedigo v. P.A.M. Transport, Inc.,* 60 F.3d 1300, 1301 (8th Cir. 1995).

While the "same decision" affirmative defense was a matter of some discussion at trial and AGP claimed in its Motion for Judgment as a Matter of Law (Doc. No. 64) that it

### 3. Sufficiency of the evidence—punitive damages

■■■ The ADA provides that the Title VII remedies apply to any person alleging discrimination on the basis of a disability. 42 U.S.C. § 12117(a). Under the Civil Rights Act of 1991, punitive damages are available in claims under Title VII, 42 U.S.C. § 2000e *et seq.* and the ADA, 42 U.S.C. § 12101 *et seq.* They are, however, limited to cases in which the employer "has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 530–31, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (citing 42 U.S.C. § 1981a(b)(1)). In this case, the jury awarded $90,000.00 in punitive damages on Mr. Knutson's perceived disability claim. AGP argues in this motion for judgment as a matter of law that there was insufficient evidence for an award of punitive damages because AGP discharged Mr. Knutson for videotaping the inside of the plant without permis-

sion. The plaintiff counters that the substantial evidence of pretext, the suspicious timing of his discharge, and the jury's rejection of AGP's videotape justification support the jury's finding that AGP acted with malice or reckless indifference, thus supporting an award of punitive damages under the ADA. AGP notably does not seek a remittitur of damages or a new trial under Federal Rule of Civil Procedure 59. Instead, AGP solely seeks judgment as a matter of law that punitive damages are not appropriate.

#### a. Applicable standards

■■■ In *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 535, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), the Supreme Court established a "two-tiered" analysis to determine when a party is entitled to punitive damages. That analysis requires that a plaintiff not only establish intentional discrimination but also "malice or reckless indifference" to the federally protected rights of the plaintiff. *Id.; accord Webner v. Titan Distribution, Inc.,* 267

---

proved the defense, AGP did not brief this argument. Arguments raised but not briefed are deemed abandoned. *See Bickel v. Korean Air Lines Co.,* 96 F.3d 151, 154 (6th Cir.1996) (holding that arguments not fully briefed are deemed abandoned); *In re Perry Hollow Mgmt. Co.,* 260 B.R. 58, 65 n. 8 (D.N.H.2001) ("On appeal, Yamaha listed issues challenging the bankruptcy court's decision to authorize the sale, to deny its motion for a stay pending appeal of that order, and to waive the ten-day stay provided by Rule 6004(g). Since Yamaha briefed only the issue challenging the bankruptcy court's decision to waive the automatic ten-day stay under Rule 6004(g), the other issues are deemed waived."), *aff'd,* 297 F.3d 34 (1st Cir.2002); *cf. King v. Town of Hanover,* 116 F.3d 965, 970 (1st Cir.1997) ("It is an established appellate rule that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.... It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work.... Judges are not

expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.'") (quoting *Willhauck v. Halpin,* 953 F.2d 689, 700 (1st Cir.1991)).

Even if this argument were not waived by AGP's failure to brief it, which the court finds it is, the argument fails on its merits. As indicated above, the jury rejected AGP's contention that it discharged Mr. Knutson for videotaping inside the plant without permission, and the court found, above, that the evidence supported this conclusion. The court also instructed the jury on this partial affirmative defense, and the jury likewise specifically found that AGP failed to prove that it would have terminated Mr. Knutson even if it had not considered Mr. Knutson's perceived limitations in making the decision to terminate him. [Final Jury Instruction No. 3, at 22; Verdict Form]. The evidence, likewise, supports this conclusion. Thus, the full spectrum of remedies under the ADA remain available to Mr. Knutson.

F.3d 828, 837 (8th Cir.2001) ("Punitive damages are warranted where the plaintiff shows that the defendant engaged in a discriminatory practice 'with malice or with reckless indifference' to the plaintiff's federally protected rights.") (quoting 42 U.S.C. § 1981a(b)(1) (1994)) (citing *Kolstad,* 527 U.S. at 535, 119 S.Ct. 2118; *Ogden v. Wax Works, Inc.,* 214 F.3d 999, 1008 (8th Cir.2000)); *Foster v. Time Warner Entertainment Co., L.P.,* 250 F.3d 1189, 1196 (8th Cir.2001) (same) (citing *Kolstad,* 527 U.S. at 535, 119 S.Ct. 2118); *Otting v. J.C. Penney Co.,* 223 F.3d 704, 711 (8th Cir.2000) (same) (citing 42 U.S.C. § 1981a(b)(1)); *cf. Kim v. Nash Finch Co.,* 123 F.3d 1046, 1066 (8th Cir.1997) (punitive damages are available in Title VII case under same standard as under 42 U.S.C. § 1981). This is so because "[s]ection 1981a(a)(1) limits compensatory and punitive awards to instances of intentional discrimination, while § 1981a(b)(1) [the provision authorizing punitive damages] requires plaintiffs to make an additional 'demonstrat[ion]' of their eligibility for punitive damages. Congress plainly sought to impose two standards of liability—one for establishing a right to compensatory damages and another, higher standard that a plaintiff must satisfy to qualify for a punitive award." *Kolstad,* 527 U.S. at 534, 119 S.Ct. 2118. The Eighth Circuit Court of Appeals likewise has employed this two-tiered analysis regarding punitive damages. *E.g., Ogden,* 214 F.3d at 1008; *Kimbrough v. Loma Linda Dev., Inc.,* 183 F.3d 782, 785 (8th Cir.1999); *Deneen v. Northwest Airlines, Inc.,* 132 F.3d 431, 439 (8th Cir.1998); *Browning v. President Riverboat Casino–Missouri, Inc.,* 139 F.3d 631, 637 (8th Cir.1998); *Coffman v. Tracker Marine, L.P.,* 141 F.3d 1241, 1248 (8th Cir.1998); *Nash Finch,* 123 F.3d at 1063.

 "It should be presumed a plaintiff has been made whole for his [or her] injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment and deterrence." *State Farm Mutual Auto. Insurance Co. v. Campbell,* —— U.S. ——, ——, 123 S.Ct. 1513, 1521, 155 L.Ed.2d 585 (2003) (citing *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)). Absent a showing that a punitive damages award unreasonably "exceeds an amount that will accomplish society's goals of punishment and deterrence," or is somehow violative of due process, courts should respect the jury's imposition of damages. *See Pacific Mutual Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); *McKinnon v. City of Berwyn,* 750 F.2d 1383 (7th Cir.1984) ("Seventh Amendment reserves the determination of damages, in jury trials within its scope, to the jury").

 In considering whether AGP acted with malice or reckless indifference, thus warranting punitive damages, the court must view the evidence in the light most favorable to Mr. Knutson. *See Salitros v. Chrysler Corp.,* 306 F.3d 562, 570 (8th Cir.2002); *Denesha v. Farmers Ins. Exch.,* 161 F.3d 491, 503 (8th Cir.1998) (considering challenge to punitive damages award under abuse of discretion standard, which requires the court to view the evidence in the light most favorable to the prevailing party). "Federal law imposes a formidable burden on plaintiffs who seek punitive damages" in employment discrimination cases. *Henderson v. Simmons Foods, Inc.,* 217 F.3d 612, 618 (8th Cir. 2000). The question the court must answer is "whether the present record contains sufficient evidence to 'reveal whether a reasonable jury could have found' [AGP] liable for punitive damages." *Ogden,* 214 F.3d at 1009 n. 16 (quoting *Todd v. Ortho*

*Biotech, Inc.,* 175 F.3d 595, 598–99 (8th Cir.1999)). To determine whether Mr. Knutson met his burden, the court must ensure that the punitive damages standards as announced in, among other cases, *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and *State Farm Mutual Automobile Insurance Co. v. Campbell,* —— U.S. ——, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), have been met, even though *State Farm* was not decided until after the trial in this case. *See Ogden,* 214 F.3d at 1009 n. 16 (applying *Kolstad* intent and agency standard to pre-*Kolstad* trial and stating that the court must "apply the law as it exists today, 'not what the court announced the law to be in its instructions.' ") (quoting *Grand Labs., Inc. v. Midcon Labs of Iowa,* 32 F.3d 1277, 1280 (8th Cir.1994)) (citing *Harper v. Virginia Dep't of Taxation,* 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) (Supreme Court decisions apply retroactively and prospectively to all cases on direct appeal whenever applied to the litigants before the Court)).

#### b. *Analytical framework*

The Supreme Court developed an analytical framework to determine whether a prevailing civil rights plaintiff is entitled to punitive damages. *See Kolstad,* 527 U.S. at 536, 119 S.Ct. 2118. This framework requires the court to consider whether the plaintiff established the following: (1) that the employer acted with the requisite mental state, *i.e.,* that the employer acted "in the face of a perceived risk that its actions will violate federal law," *id.*; (2) that liability may be imputed to the defendant employer by showing that the employees who discriminated against the plaintiff are managerial agents acting within the scope of their employment, *id.* at 539, 119 S.Ct. 2118; and, (3) even if the plaintiff establishes that the employer's managerial agents recklessly disregarded her federally protected rights, that the employer failed to engage in good faith efforts to implement an anti-discrimination policy, *id.* Here, AGP does not dispute that Mr. Parker is a managerial agent who Mr. Knutson contends discriminated against him.[9] Mr. Parker admits to being the ultimate decision-maker in AGP's decision to terminate Mr. Knutson. Mr. Knutson introduced sufficient evidence at trial, as discussed above, that this decision was motivated by discriminatory animus, and, therefore, his discriminatory actions can be imputed to AGP. AGP also does not argue in this post-trial motion that it engaged in good faith efforts to implement an anti-discrimination policy, and it did not present any evidence at trial tending to support any such efforts. Thus, the court will address the first and only disputed part of this analytical framework—whether or not AGP acted with the requisite

---

9. AGP made passing reference in its brief to Mr. Brown's involvement (or lack thereof) in the decision-making process. Specifically, AGP states that Mr. Brown's directive not to touch a button is irrelevant to whether or not AGP (by way of Mr. Parker) was motivated by discriminatory animus because Mr. Brown had nothing to do with the termination decision. However, there was sufficient evidence from which to conclude that Mr. Parker discriminated against Mr. Knutson. Like Mr. Brown, he, too, perceived Mr. Knutson to be substantially limited in the major life activity of working and determined that Mr. Knutson could not perform the boiler operator position, nor any other position at AGP.

Moreover, similar to the situation presented in *Thomlison v. City of Omaha,* 63 F.3d 786, 789 (8th Cir.1995), the jury could rationally infer that Mr. Brown communicated his perception of Mr. Knutson's physical limitations to Mr. Parker, who simply rubber-stamped Mr. Brown's perceptions.

mental state when it discharged Mr. Knutson.

#### c. *Malice or reckless indifference*

■ There are a variety of ways plaintiffs can show their employers' reckless indifference to their federally protected rights. The Supreme Court clarified that "[t]he terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad*, 527 U.S. at 535, 119 S.Ct. 2118. For that reason, the Court remarked that this factor would not be satisfied when the employer was unaware of the federal prohibition or acted with the distinct belief that its discrimination was lawful. *Id.*

■ The *Kolstad* Court further explained that, although conduct justifying a punitive damages award is sometimes characterized as egregious or outrageous, it "is not to say that [defendants] must engage in conduct with some independent, 'egregious' quality before being subject to a punitive award." *Id.* Instead, egregious conduct is evidence of the employer's mental state, but need not be independently shown to warrant the imposition of punitive damages. *Id.*

In *Kolstad*, the Supreme Court determined that, to warrant punitive damages, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law." *Id.* at 536, 119 S.Ct. 2118. Here, the jury found that AGP acted with malice or reckless indifference to Mr. Knutson's right not to be discriminated against on the basis of his perceived disability. Specifically, the jury was instructed that punitive damages were appropriate if Mr. Knutson proved by the greater weight of the evidence that AGP knew that terminating him was in violation of the law prohibiting perceived disability discrimination or that AGP acted with

reckless disregard of that law. [Final Jury Instruction No. 6]. AGP did not object to the substance of this punitive damages instruction. Having imposed punitive damages liability on AGP, the jury concluded that AGP acted with the requisite mental state.

Here, AGP does not argue that it was unaware of the relevant provisions making perceived disability discrimination unlawful. The jury found that AGP intentionally discriminated against Mr. Knutson, and the evidence is sufficient to support that conclusion, as discussed above. Thus, when AGP discharged Mr. Knutson because of his perceived disability, it flaunted and disregarded the law of which it was aware, subjecting AGP to punitive damages liability.

■ In *Kolstad*, the Court held that there are certain circumstances in which intentional discrimination does not give rise to punitive damages liability even where the employer discriminates in the face of a perceived risk that its actions will violate federal law. *Id.* at 536, 119 S.Ct. 2118. These exceptions include the following: an employer may be "unaware of the relevant federal prohibition"; it may very well believe that "its discrimination is lawful"; the theory on which an employee premises his claim may be "novel or poorly recognized"; or an employer may "reasonably believe" that it has a bona fide defense to charges of discrimination either because of its occupational qualifications or statutory exceptions. *Id.*

AGP has not argued that any of these exceptions apply to this case because it continues to deny that it engaged in disability discrimination when it discharged Mr. Knutson. It argues that punitive damages are inappropriate because it discharged Mr. Knutson for videotaping inside the plant without permission; thus, AGP claims that it could not have had the

requisite mental state to warrant punitive damages because it simply did not discriminate. As explained above, the record contains sufficient evidence that AGP engaged in unlawful discrimination and there was substantial evidence that AGP's proffered legitimate justification for its decision to terminate Mr. Knutson is a phony one. The jury specifically found that AGP did not terminate Mr. Knutson because of his unauthorized videotaping.

The court must view the evidence in the light most favorable to the plaintiff. *E.g., Cross v. Cleaver*, 142 F.3d 1059, 1066 (8th Cir.1998). The court cannot accept AGP's contention concerning why punitive damages should not be imposed in this case without sitting as a super-juror and overturning the jury's findings that AGP unlawfully discriminated against Mr. Knutson and did not terminate him because he videotaped inside the confines of the plant walls. These findings were reasonable, were based on sufficient evidence, and were reached only after making several credibility determinations.

The court must respect the reasonable factual findings made by a jury of AGP and Mr. Knutson's peers. This is so because "[t]he right of jury trial in civil cases at common law is a basic and fundamental feature of our system of federal jurisprudence which is protected by the Seventh Amendment. A right so fundamental and sacred to the citizen, whether guaranteed by the Constitution or provided by statute, should be jealously guarded by the courts." *Jacob v. City of New York*, 315 U.S. 752, 752–53, 62 S.Ct. 854, 86 L.Ed. 1166 (1942); *accord Kampouris v. St. Louis Symphony Soc'y*, 210 F.3d 845, 849 (8th Cir.2000) (Bennett, J., dissenting). In light of the court's role on this post-trial motion and in light of the evidence produced at trial, the court would be failing to "jealously guard" Mr. Knutson's Seventh Amendment right to a trial were it to grant AGP's motion.

The court concludes that there is sufficient evidence in the record such that a reasonable jury could have concluded that AGP acted with reckless indifference to Mr. Knutson's rights under the ADA. First, the court points out that Mr. Knutson disputed the reason that AGP presented during the trial for its decision to terminate Mr. Knutson—the videotape. Mr. Parker testified that, had Mr. Knutson asked for permission to videotape, AGP likely would have allowed him to do so. AGP consistently relied on a safety rule that, by its plain language, did not apply to plant floor employees, such as Mr. Knutson. In addition, Mr. Knutson testified that, although he experienced pain on the job, he could still perform the essential functions. His testimony is buttressed by his doctors' restrictions, which did not preclude him from performing any of the functions (both essential and marginal) of the boiler operator position.

Moreover, that AGP waited nearly four months before terminating Mr. Knutson while confronting Mr. Askvig the very same day that it learned of his participation in the videotape's making is cause for suspicion. In short, this was an issue for the jury, and clearly the jury did not believe that AGP terminated Mr. Knutson because of the videotape. A reasonable jury could have determined that AGP's conduct was malicious or recklessly indifferent to Mr. Knutson's rights under the ADA because a reasonable jury could have determined that AGP's reason for terminating him was pretextual. As such, AGP's decision to terminate him because it perceived his impairments as being substantially limiting was in complete disregard of the ADA's protections. Therefore, the court finds that punitive damages are appropriate in this case and AGP's motion

for judgment as a matter of law is denied.[10]

■ Moreover, while AGP did not claim that the $90,000.00 awarded to the plaintiff is constitutionally excessive, the court has reviewed the award, applied the pertinent standards, and finds that an award less than twice as much as Mr. Knutson's backpay award imposed on a company of AGP's wealth is constitutionally permissible and reasonable in relation to the injury inflicted and the degree of reprehensibility of AGP's conduct. The court, consequently, will not reduce the jury's award. *See Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1331 (11th Cir.1999); ("[A] court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause."); *see also Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1049–50 (8th Cir.2002) ("[T]he action the district court took was not actually a remittitur, but instead was simply a reduction of the excessive punitive damages award in conformity with constitutional limits.... While the traditional remedy of remittitur does require the plaintiff's consent in order to comport with the Seventh Amendment right to jury trial ... the court's

mandatory review of a punitive damages award does not implicate the Seventh Amendment.").

### B. Plaintiff's Motion for Prohibitory Injunction and Reinstatement

■ Shortly after trial, on February 28, 2003, the plaintiff moved for reinstatement, together with a prohibitory injunction enjoining the defendant from discriminating against him.[11] AGP resisted this request for reinstatement, arguing that Mr. Knutson's physical limitations preclude him from performing the essential functions of the boiler operator position or any other non-management job at AGP. Mr. Knutson filed a reply to AGP's resistance, in which he reasserts his entitlement to reinstatement and, in the alternative, seeks an award of front pay in the event the court were to determine reinstatement infeasible or inappropriate.

#### 1. Prospective equitable relief available under the ADA

■ The ADA, like other federal antidiscrimination laws, supplies broad legal and equitable remedies to make successful plaintiffs whole.[12] 42 U.S.C. § 2000e–5; *see also McKennon v. Nashville Banner*

**10.** AGP also claimed that Mr. Knutson did not meet the threshold showing under Iowa law for the imposition of punitive damages liability. The court need not address this argument because punitive damages are not available under the ICRA. *E.g., Chauffeurs, Teamsters & Helpers, Local Union No. 238 v. Iowa Civil Rights Comm'n*, 394 N.W.2d 375, 382–84 (Iowa 1986).

**11.** AGP claims in its brief that Mr. Knutson cannot seek reinstatement or front pay because he did not request such relief in his complaint. While pleading front pay clearly would have been the most prudent route, the court is authorized to award any relief to which a plaintiff is entitled, under Federal Rule of Civil Procedure 54(c). Front pay and reinstatement are ordinary equitable remedies

under the ADA, and the facts pleaded clearly gave rise to a claim for them. Thus, Mr. Knutson's failure to plead front pay or reinstatement is not fatal under the facts of this case.

**12.** Title VII of the Civil Rights Act of 1964 was amended by the Civil Rights Act of 1991, Pub.L. 102–166, 105 Stat. 1071. *Caviness v. Nucor–Yamato Steel Co.*, 105 F.3d 1216, 1218 (8th Cir.1997). Prior to the 1991 amendments, only equitable relief was available under the Act. *Id.* "Section 102 of the 1991 Act, however, now makes it possible for a successful plaintiff 'to recover compensatory and punitive damages for certain violations of Title VII.'" *Id.* (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 247, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)).

*Publ'g Co.*, 513 U.S. 352, 357–58, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995) (discussing various federal anti-discrimination laws and the means of relief available); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (stating that "[t]he 'make whole' purpose of Title VII is made evident by the legislative history."); *Cowan v. Strafford R–VI Sch. Dist.*, 140 F.3d 1153, 1160 (8th Cir. 1998) (acknowledging the court's obligation "to fulfill the make-whole purposes of Title VII"). Among the myriad of remedies available to individuals who prevail on their claims of employment discrimination are two alternative types of equitable prospective relief: reinstatement and front pay.[13] *Newhouse v. McCormick & Co.*, 110 F.3d 635, 641 (8th Cir.1997). These equitable remedies may be awarded to compensate successful plaintiffs for lost future earnings. *Feldman v. Philadelphia Hous. Auth.*, 43 F.3d 823, 832–33 (3d Cir. 1994).

■ The purpose of and method for calculating these equitable remedies have been characterized in largely the same manner whether relief is sought under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, (ADA), Title VII, 42 U.S.C. § 2000e *et seq.*, or the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, (ADEA). *Lussier v. Runyon*, 50 F.3d 1103, 1107–08 (1st Cir.1995). The choice of which prospective equitable remedy, if either, should be awarded in a given case is committed to the sound discretion of the trial court. *E.E.O.C. v. HBE Corp.*, 135 F.3d 543, 555 (8th Cir. 1998); *Mason v. Oklahoma Turnpike Auth.*, 115 F.3d 1442, 1458 (10th Cir.1997);

*Suggs v. ServiceMaster Educ. Food Mgmt.*, 72 F.3d 1228, 1234 (6th Cir.1996); *Standley v. Chilhowee R–IV Sch. Dist.*, 5 F.3d 319, 322 (8th Cir.1993); *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1056 (7th Cir.1990).

In *Ogden v. Wax Works, Inc.*, 29 F.Supp.2d 1003, 1008–15 (N.D.Iowa 1998), *aff'd*, 214 F.3d 999 (8th Cir.2000), this court provided a comprehensive examination of reinstatement and front pay as remedies for prospective equitable relief available under Title VII, which apply equally to ADA cases, as well as examined the factors considered in ordering reinstatement and in awarding front pay. *Id.* The court, therefore, will not expound upon those remedies and factors extensively here. Rather, the court will address the remedies and apply the pertinent factors.

### 2. *Appropriateness of reinstatement*

■ "Reinstatement is the preferred remedy for unlawful employment discrimination, and front pay is the disfavored alternative, available only when reinstatement is impracticable or impossible." *Salitros v. Chrysler Corp.*, 306 F.3d 562, 572 (8th Cir.2002) (citing *Kucia v. Southeast Ark. Cmty. Action Corp.*, 284 F.3d 944, 948–49 (8th Cir.2002)). This is so because,

> Reinstatement constitutes a more equitable resolution than an award of front pay. *Blum v. Witco Chem. Corp.*, 829 F.2d 367, 373 (3d Cir.1987) ("[b]ack pay coupled with reinstatement is the preferred remedy [for] future damages") (ADEA claim). Not only would Plaintiff receive compensation for continued unemployment resulting from Defendant's

---

13. The United States Court of Appeals for the First Circuit apparently takes issue with the characterization of reinstatement and front pay as "alternative" remedies. In *Selgas v. American Airlines, Inc.*, 104 F.3d 9, 13 (1st Cir.1997), the court explained that these remedies are not mutually exclusive because "[f]ront pay takes a plaintiff to the point of employability. Reinstatement at that point would, in effect, 'perfect' the remedy because the plaintiff would be back in the very job she lost unlawfully."

discrimination, but Defendant would have a more equitable result of receiving her services and compensating her therefor. *See Truskoski v. ESPN, Inc.,* 823 F.Supp. 1007, 1015–16 (D.Conn. 1993) (gender retaliation claim).

*Shaw v. Greenwich Anesthesiology Assocs., P.C.,* 200 F.Supp.2d 110, 114 (D.Conn.2002).

 The Eighth Circuit has held that reinstatement is an inappropriate equitable remedy for intentional employment discrimination only under special circumstances. *Thomlison v. City of Omaha,* 63 F.3d 786, 789–90 (8th Cir.1995). "When awarding relief based on intentional discrimination, the district court generally has discretion to require reinstatement." *Id.* at 789. In a case brought under the ADEA, a district court similarly held that the jury's finding of liability entitled the plaintiff to reinstatement absent extraordinary circumstances. *Cleverly v. Western Elec. Co.,* 450 F.Supp. 507, 511 (W.D.Mo. 1978), *aff'd,* 594 F.2d 638 (8th Cir.1979). In that case, reinstatement was not appropriate because the employer showed that, due to a reduction in force, the plaintiff would not have been employed at the time of the post-verdict hearing even in the absence of unlawful discrimination. *Id.*

 Special circumstances that counsel strongly against reinstatement include, for instance, when the parties are embroiled in a hostile relationship, when reinstatement would result in an unproductive working relationship, and when reinstatement would exacerbate the plaintiff's emotional distress that resulted from the defendant's intentional discrimination. *See Woodhouse v. Magnolia Hosp.,* 92 F.3d 248, 257–58 (5th Cir.1996) ("[F]ront pay may be awarded if reinstatement is not feasible" because a hostile relationship exists between the employer and the plaintiff); *Marshall v. TRW, Inc.,* 900 F.2d 1517, 1523 (10th Cir. 1990) (reversing award of front pay where

two employees who made the decision to discharge Marshall were no longer employed by TRW); *Morgan v. Arkansas Gazette,* 897 F.2d 945, 953 (8th Cir.1990) (affirming reinstatement order where any animosity was eradicated inasmuch as employees responsible for the discrimination no longer worked for The Arkansas Gazette); *Jackson v. City of Albuquerque,* 890 F.2d 225, 232 (10th Cir.1989) (reversing district court's denial of reinstatement where "most of those making complaints against [Jackson] are no longer employed" by the City's park department); *Doyne v. Union Elec. Co.,* 755 F.Supp. 866, 870 (E.D.Mo.1991) ("Court believes that to force defendant to reinstate plaintiff, in a position comparable to that which he held at termination, would result in an unsatisfactory and unproductive employment relationship. Such a shotgun marriage is particularly inappropriate...."), *remanded,* 953 F.2d 447 (8th Cir.1992). In this case, the parties are not hostile. Indeed, animosity between them is decidedly absent. At trial, the parties exhibited mutual respect for one another, and Mr. Parker testified that Mr. Knutson was a valued and talented employee.

Moreover, the jury found that Mr. Knutson did not suffer any emotional distress damages. Consequently, returning to work would not exacerbate any lingering emotional distress, such as was the case in *Baker v. John Morrell & Co.,* 263 F.Supp.2d 1161 (N.D.Iowa 2003). In *Baker,* a trial over which this court presided, the plaintiff suffered extraordinary emotional distress damages resulting from the defendant's unlawful conduct. *Id.* at 1173–75. She suffered from severe depression, anxiety attacks, sleeplessness, mental breakdowns, weight loss, and she ultimately attempted suicide. *Id.* She continued to suffer from anxiety and depression even after leaving John Morrell. *Id.* Requiring her to return to the work place would have been unjust, an empty remedy, and, frank-

ly, cruel. *See id.* Such is not the case with Mr. Knutson and AGP. Furthermore, even though Mr. Knutson would continue to work under Mr. Brown and Mr. Parker were the court to order reinstatement, the prohibitory injunction that Mr. Knutson seeks as a companion order to reinstatement would cure any further unlawful discrimination and prevent retaliation.

Here, the only special circumstance urged by the defendant that would preclude reinstatement is AGP's contention that Mr. Knutson's physical limitations prevent him from fulfilling the essential functions of the boiler operator position. The Eighth Circuit has recognized that a disability discrimination plaintiff's current inability to satisfy bona fide job requirements is a special circumstance that may make reinstatement inappropriate. *See Thomlison,* 63 F.3d at 790.

AGP's position on reinstatement mirrors its attack on the proof of Mr. Knutson's perceived disability claim in its motion for judgment as a matter of law. Specifically, AGP argues that pulling bottom ash and rodding the stokers are essential functions, which Mr. Knutson cannot perform, thereby making reinstatement inappropriate. However, it points to no change in Mr. Knutson's condition since he was unlawfully discharged in March of 2000 that would prevent him from performing the control room function of the job, which is the essential component, nor to any change in the boiler operator position itself. Instead, AGP's argument necessitates that the court disregard the jury's finding that Mr. Knutson could perform the essential functions of the job despite the fact he cannot pull bottom ash nor excessively rod the stokers.

 "In fashioning equitable relief, the district court may take into account facts that were not determined by the jury, but it may not base its decision on factual findings that conflict with the jury's

findings." *Salitros v. Chrysler Corp.,* 306 F.3d 562, 573 (8th Cir.2002) (citing *Gibson v. Mohawk Rubber Co.,* 695 F.2d 1093, 1101 (8th Cir.1982)); *accord Gumbhir v. Curators of Univ. of Mo.,* 157 F.3d 1141, 1145 (8th Cir.1998) ("[A] post-trial decision regarding equitable relief may not be based upon findings that conflict with those made by the jury.") (citing *Gibson,* 695 F.2d at 1101); *Newhouse v. McCormick & Co.,* 110 F.3d 635, 641 (8th Cir. 1997) ("In making a front pay award, the district court is not free to reject or contradict findings by the jury on issues that were properly submitted to the jury, but the district court 'retains its discretion to consider all the circumstances in th[e] case when it determines what equitable relief may be appropriate.'") (quoting *Gibson,* 695 F.2d at 1101); *Gibson,* 695 F.2d at 1101 ("Although the court ... retains ... discretion to consider all the circumstances in th[e] case when it determines what equitable relief may be appropriate, it cannot base its decision on its own factual findings that conflict with those expressly made by the jury.") (citations omitted). Moreover, "[w]hen analyzing whether a former employee is currently qualified for reinstatement, a presumption exists that the former employee remains qualified to perform the job." *Thomlison,* 63 F.3d at 790. The onus is on the defendant employer to show by a preponderance of the evidence the absence of current qualifications. *Id.*

In *Thomlison v. City of Omaha,* 63 F.3d 786 (8th Cir.1995), the Court of Appeals for the Eighth Circuit reversed and remanded the district court's order of reinstatement in a case brought under the Rehabilitation Act where the employer argued that the plaintiff was unable to satisfy current job requirements. In *Thomlison,* which was discussed in Section II. A.2.d of this Order as it related to the sufficiency of the evidence as to whether Mr. Knutson proved causation, the plaintiff had suffered from two work-related inju-

ries. *Id.* at 788. The defendant initiated an investigation in order to determine whether she was still physically capable of being a firefighter. *Id.* The plaintiff did not challenge the investigation presumably because the physical demands of firefighting were not in question. During the course of this investigation, however, the fire department fabricated an excuse to terminate her employment, which the jury found was because of the defendant's wrongful perception of her medical condition. *Id.* at 789.

After a verdict was returned in favor of the plaintiff, the district court ordered reinstatement. *Id.* On appeal, the defendant challenged the appropriateness of the reinstatement order without a demonstration that the plaintiff retained the level of fitness required to be a firefighter. *Id.* Reversing the reinstatement order, the *Thomlison* court stressed the public safety concerns and potential hazards involved in requiring the defendant to employ an unfit firefighter and, therefore, remanded the case for a determination of whether the plaintiff was or could become physically fit to perform the duties of a firefighter. *Id.* at 790.

Mr. Knutson's case is easily distinguishable from *Thomlison,* primarily because of the unique public safety concerns associated with being a firefighter—concerns that have no bearing on the boiler operator position in a private soybean processing plant. Moreover, in *Thomlison,* the plaintiff had suffered from some injuries that admittedly may have affected her ability to serve as a firefighter. She did not challenge the fire department's right to make sure that she remained qualified after her injuries. The employer was investigating the possible impact of her injuries at the time it wrongfully discharged her. In Mr. Knutson's case, on the other hand, Mr. Knutson performed all the essential functions of the boiler operator position for months and AGP, by its own testimony, did not have any concerns about Mr. Knutson's ability to operate the boilers from the control room. By all accounts, his performance operating the boilers during the time when AGP reallocated the non-essential functions of pulling bottom ash and rodding the stokers was, at minimum, satisfactory. Thus, while the fire department in *Thomlison* was unable to ascertain the plaintiff's fitness for duty at the time it wrongfully discharged her, here, AGP admits that, at the time he was discharged, Mr. Knutson could have performed the essential control room operator function of the boiler operator position.

In another Eighth Circuit case, *Doane v. City of Omaha,* 115 F.3d 624 (8th Cir. 1997),[14] the court affirmed the district court's reinstatement order despite the defendant employer's contention that the plaintiff was not currently able to satisfy the job requirements of a police officer. *Id.* at 629–30. In *Doane,* eight years prior to bringing suit, the plaintiff was transferred to a desk job after an eye examination revealed that he suffered from

**14.** The Eighth Circuit has recognized that the Supreme Court's holding in *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) overruled one aspect of the *Doane* court's opinion. *Weber v. Strippit, Inc.,* 186 F.3d 907, 913 (8th Cir.1999). In *Doane,* the court held that determining whether an ADA plaintiff is substantially limited must be undertaken " 'without regard to mitigating measures such as medicines, or assistive or prosthetic devices.' " *Doane,* 115 F.3d at 627 (quoting 29 C.F.R. Pt. 1630, App. § 1630.2(j)). In *Sutton,* the Supreme Court held otherwise, holding that the determination of whether an individual is substantially limited in a major life activity must take into account mitigating measures such as medicines and assistive devices. *Sutton,* 527 U.S. at 482, 119 S.Ct. 2139. This holding does not impact the *Doane* court's analysis of whether or not reinstatement is appropriate.

glaucoma in one eye. *Id.* at 625–26. The plaintiff sought to be re-hired as a police officer on several occasions, each time encountering resistance because of his "disability." [15] Ultimately, he filed suit under the ADA, and the jury returned a verdict in his favor. *Id.* Post-verdict, the district court ordered the police department to allow the plaintiff to participate in police recruit training, as opposed to reinstating him as a sworn, on-duty officer, because he had been out of the police force for eight years. *Id.* at 629. The court found that, aside from the *Doane* plaintiff's disability, the defendant presented no evidence to indicate that he was unfit for the job. *Id.* at 630.

Because he established at trial that he was qualified to perform the essential functions of the job, the plaintiff was presumed to be entitled to reinstatement. *Id.* at 629. In so holding, the *Doane* court extended the *Thomlison* court's presumption of current qualification in wrongful discharge cases to wrongful re-hire cases, holding that the district court was correct in placing the burden on the defendant employer to show the absence of current job qualifications. *Id.* at 630. A showing of the same disability that the jury previously determined did not prevent the plaintiff from performing the essential functions of the job was insufficient to rebut the presumption of entitlement to reinstatement. *See id.*

In Mr. Knutson's case, as in *Doane,* Mr. Knutson is presumed to be entitled to reinstatement, and AGP has not come forward with any new evidence that would tend to show that Mr. Knutson is unable to perform the essential functions of the boiler operator position. Instead, it relies on the same physical limitations that the jury found did not disqualify Mr. Knutson from

performing the essential functions. Some additional medical records were presented on this post-trial motion, but none of them indicates that Mr. Knutson could not perform the control room operator tasks, nor that Mr. Knutson's medical condition has changed since the time of trial. In its resistance to Mr. Knutson's request for reinstatement, AGP primarily relies upon the medical opinion of Dr. Justin Ban and, specifically, his opinion that Mr. Knutson's shoulder injury and its concomitant restrictions are permanent. However, Mr. Knutson's shoulder condition does not affect his ability to perform the essential functions of the boiler operator position, as those functions were determined by the jury.

At trial, the testimony consistently indicated that the control room operator function of the boiler operator position required minimal physical exertion. Moreover, Mr. Knutson testified at trial that, in his current condition, he could supervise the control room. Mr. Parker also testified that Mr. Knutson was able to perform the control room operator duties. He testified that, with the exception of pulling bottom ash and rodding the stokers, Mr. Knutson was fit to perform the duties of a boiler operator. This testimony was offered at trial, notably *after* the date of Dr. Ban's medical opinion: he authored his medical opinion of Mr. Knutson's condition on October 28, 1999, which was over two years before the trial in this case. [Deft.'s exh. E].

In short, like the defendant in *Doane,* AGP has done nothing to rebut the presumption that Mr. Knutson is entitled to reinstatement—a presumption which arose out of the jury's finding that Mr. Knutson is a qualified individual who was subjected to unlawful discrimination. Indeed, in

---

**15.** While the *Sutton* ruling would have precluded a finding that the plaintiff was disabled within the meaning of the ADA were

*Doane* decided today, for the purposes of the analysis in Mr. Knutson's case, disability is assumed to have been established.

AGP's brief in opposition to the plaintiff's motion for reinstatement, it argued, "As AGP has argued in its motion for judgment as a matter of law, Knutson is not 'otherwise qualified,' and he cannot take out this element of his ADA claim, which entitles AGP to judgment in its favor as a matter of law." [Doc. No. 77 (Deft.'s Br., at 8)].

This statement makes clear that AGP's argument that reinstatement is inappropriate is the exact argument it made concerning whether Mr. Knutson was a "qualified individual" within the meaning of the ADA. In fact, AGP has not even attempted to show that Mr. Knutson's physical condition has changed or that the boiler operator position itself has changed since the time of his discharge. Thus, in order to accept AGP's argument against reinstatement, the court would have to reject the jury's findings regarding Mr. Knutson's ability to perform the essential functions of the job.

This the court cannot do absent a showing of a change in Mr. Knutson's condition or in the position itself. *See Gibson,* 695 F.2d at 1101 ("Although the court . . . retains . . . discretion to consider all the circumstances in th[e] case when it determines what equitable relief may be appropriate, it cannot base its decision on its own factual findings that conflict with those expressly made by the jury.") (citations omitted). Because, as the court articulated above in considering AGP's motion for judgment as a matter of law, the evidence was sufficient for a rational jury to conclude that Mr. Knutson was able to perform the essential functions of the boiler operator position, the court must afford him the full presumption that he is entitled to reinstatement. Because AGP has presented no evidence to rebut this presumption, the court will order that AGP reinstate Mr. Knutson to his former position as a boiler operator in the Eagle Grove, Iowa plant.[16]

---

**16.** AGP also argued that reinstatement was inappropriate because an employer has a right under the ADA to require a medical release as a pre-requisite for re-hiring a former employee with a known disability. *See Conroy v. New York State Dept. of Correctional Servs.,* 333 F.3d 88 (2d Cir.2003); *Harris v. Harris & Hart, Inc.,* 206 F.3d 838, 845 (9th Cir.2000). The court need not linger long on this argument because it is entirely inapposite to the issue before the court on Mr. Knutson's motion for reinstatement. In *Harris,* the case relied on by AGP, the court held that the ADA's medical inquiry exceptions, as outlined in 42 U.S.C. § 12112(d)(2) and case-law, applied to re-hire cases as well as to pre-employment cases, thus permitting employers to make inquiries into former employees' medical status where an employer could reasonably believe that the known disability of a former employee seeking re-hire will interfere with the performance of a job-related function. *Harris,* 206 F.3d at 845.

Under the ADA, an employer may require medical proof that an employee is capable of performing the essential functions of a position. 42 U.S.C. § 12112(d)(4); *accord Harris,*

206 F.3d at 844 ("Given that plaintiff had previously requested accommodation of his disability for the same position, defendant was not prohibited from requesting documentation from an appropriate medical professional concerning plaintiff's condition."); *Grenier v. Cyanamid Plastics, Inc.,* 70 F.3d 667, 677 (1st Cir.1995) ("[T]he employer must be able to assess the extent of the applicant's recovery from inability to perform."); *Brumley v. Pena,* 62 F.3d 277, 279–80 (8th Cir. 1995) (upholding requirement that former employee provide medical clearance to return to work after having been on disability leave). Here, the jury already found that Mr. Knutson could perform the essential functions of the job, and AGP has done nothing to rebut the presumption that he remains qualified to do so. Moreover, AGP seeks medical information only to the extent it relates to Mr. Knutson's ability to pull bottom ash and to rake coal; AGP does not contest Mr. Knutson's medical ability to perform the control room operator functions of the job, nor could it contest his ability to do so on the record before the court. Hence, a medical inquiry is not necessary, nor would it preclude reinstatement.

### 3. *Prohibitory Injunction*

 In addition to reinstatement, the plaintiff requested a prohibitory injunction, enjoining AGP from any further perceptions of disability discrimination and any retaliatory conduct toward him on the basis of AGP's illegal activities or the verdict. (Doc. No. 62). For good cause established, and pursuant to the court's broad equitable powers under 42 U.S.C. § 2000e–5, the plaintiff's motion is granted, and, upon Mr. Knutson's reinstatement, AGP is enjoined from discriminating against Mr. Knutson on the basis of his perceived disability and is enjoined from retaliating against him.

### 4. *Front pay*

 Mr. Knutson also requested front pay from the date of this decision until such time as AGP reinstates him. AGP argues front pay is inappropriate because there is no evidence Mr. Knutson would have remained in the boiler operator position in light of his application for Social Security Disability Insurance ("SSDI") benefits.

The Social Security Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any . . . physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The SSDI claimant's impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(2)(A). In applying for SSDI benefits, Mr. Knutson evidently attested to his belief that he fit this definition, though neither party presented the court with Mr. Knutson's SSDI application.

 The fact he applied for SSDI benefits and represented himself as having a total disability, however, is not dispositive. *Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). This is so "primarily because the Social Security disability standard does not take into account ability to work with a reasonable accommodation." *Moore v. Payless Shoe Source, Inc.,* 139 F.3d 1210, 1212 (8th Cir.1998), *adhered to after Supreme Court remand by,* 187 F.3d 845 (8th Cir.1999). Thus, a sworn representation of "total disability" may be a legal conclusion and thus differ from a purely factual statement. *Cleveland,* 526 U.S. at 801–02, 119 S.Ct. 1597. Still, "while [an ADA claimant's] filing of an application for disability benefits does not automatically preclude him from being an ADA-qualified individual, he cannot escape the import of his prior sworn statements [that he was totally disabled]." *Downs v. Hawkeye Health Servs., Inc.,* 148 F.3d 948, 951 (8th Cir.1998); *see also Cleveland,* 526 U.S. at 806, 119 S.Ct. 1597.

The Supreme Court has held that, "despite the appearance of conflict that arises from the language of the two statutes [the ADA and the Social Security Act], the two claims do not inherently conflict to the point where courts should apply a special negative presumption. . . . That is because there are too many situations in which an SSDI claim and an ADA claim can comfortably exist side by side." *Cleveland,* 526 U.S. at 802–03, 119 S.Ct. 1597. Moreover, "if an individual has merely applied for, but has not been awarded, SSDI benefits, any inconsistency in the theory of the claims is of the sort normally tolerated by our legal system." *Id.* at 805, 119 S.Ct. 1597.

Here, the Social Security Administration denied Mr. Knutson's claim for benefits. Further, his prior sworn statements in his

SSDI application did not take into account the prospect of accommodation as contemplated under the ADA. Consequently, a claim of "total disability" in his SSDI application does not preclude his assertion that he can perform the essential functions of the boiler operator job. As illustrated above, Mr. Knutson has presented sufficient evidence to show that he indeed is capable of performing the essential functions of the boiler operator job, and, therefore, front pay is not excluded as a potential make whole remedy.

Nevertheless, even though the evidence shows that Mr. Knutson would have remained at AGP and could have performed the essential functions of the job, the court lacks sufficient information on which to base an award of front pay.

### C. Motion for Attorney's Fees

The plaintiff seeks an award of attorney's fees in the amount of $37,560.00 and an award of costs in the amount of $5,871.06. The amount requested for attorney's fees represents 125.2 hours at an hourly rate of $200, with a 1.5 multiplier. These amounts are current through March 13, 2003 and do not include plaintiff's counsel's time and costs for defending against AGP'S post-trial motions.

#### 1. Applicable standards

"In the United States, parties are ordinarily required to bear their own attorney's fees—the prevailing party is not entitled to collect from the loser." *Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Resources,* 532 U.S. 598, 602, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d

141 (1975)). Under this "American Rule," courts "follow 'a general practice of not awarding fees to a prevailing party absent explicit statutory authority.'" *Id.* (quoting *Key Tronic Corp. v. United States,* 511 U.S. 809, 819, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994)). Here, Congress and the Iowa legislature have authorized an award of attorney's fees. The ADA fee-shifting provision grants the district court discretion to award the prevailing party a reasonable fee, including litigation expenses and costs, as does the Iowa Civil Rights Act.[17] 42 U.S.C. § 12205; Iowa Code § 216.15(8)(a)(8). The court has discussed the standards by which fees are awarded in its prior decisions, including, for example, *Rural Water Sys. No. 1 v. City of Sioux Ctr., Iowa,* 38 F.Supp.2d 1057, 1062–63 (N.D.Iowa 1999), *aff'd,* 202 F.3d 1035 (8th Cir.2000), *Schultz v. Amick,* 955 F.Supp. 1087 (N.D.Iowa 1997), and *Houghton v. SIPCO, Inc.,* 828 F.Supp. 631 (S.D.Iowa), *vacated on other grounds,* 38 F.3d 953 (8th Cir.1994). Thus, the court will not engage in another detailed recitation of applicable standards. Instead, it suffices to say that "a prevailing plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" *Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (quoting S.Rep. No. 94–1011, p. 4 (1976), U.S.Code Cong. & Admin.News 1976, pp. 5908, 5912, in turn quoting *Newman v. Piggie Park Enters., Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968)); *accord Schultz,* 955 F.Supp. at 1109.

Fees are usually calculated according to the "lodestar" method, which

---

17. The attorney's fee provision in the ADA borrows its fee-shifting language from other civil rights statutes and, therefore, carries the same underlying policies. *See Bercovitch v. Baldwin Sch., Inc.,* 191 F.3d 8, 10–11 (1st Cir.1999) (attorney's fee provision in ADA intended to be interpreted consistently with other civil rights laws); *accord Roe v. Cheyenne Mountain Conference Resort, Inc.,* 124 F.3d 1221, 1232 (10th Cir.1997).

multiplies hours reasonably expended by a reasonable hourly rate. *Schultz,* 955 F.Supp. at 1110; *accord Warren v. Prejean,* 301 F.3d 893, 904 (8th Cir.2002) (" 'The starting point in determining attorney fees is the lodestar, which is calculated by multiplying the number of hours expended by the reasonable hourly rates.' ") (quoting *Fish v. St. Cloud State Univ.,* 295 F.3d 849, 851 (8th Cir.2002)). Still, under *Hensley,* "the most critical factor is the degree of success obtained." *Hensley,* 461 U.S. at 436, 103 S.Ct. 1933; *see also Emery v. Hunt,* 272 F.3d 1042, 1047 (8th Cir.2001) (characterizing *Hensley* standard as "result-oriented") (quoting *Hensley,* 461 U.S. at 436, 103 S.Ct. 1933; citing *Jenkins v. Missouri,* 127 F.3d 709, 718 (8th Cir. 1997) (en banc)). The process of arriving at what constitutes a reasonable rate includes consideration of "the plaintiff's overall success; the necessity and usefulness of the plaintiff's activity in the particular matter for which fees are requested; and the efficiency with which the plaintiff's attorneys conducted that activity." *Jenkins,* 127 F.3d at 718. Reductions may be made, however, for such things as partial success, duplicative hours or hours not reasonably expended, *Schultz,* 955 F.Supp. at 1111–12, 1114–16, or for "block billing" or poor record-keeping. *See Houghton,* 828 F.Supp. at 643–44.

In this case, AGP claims that fees should be reduced for the claims dismissed prior to trial and for inadequate documentation of time. In addition, AGP asserts that the court should reduce Mr. Knutson's counsel's claimed hourly rate of $200.[18] Regarding the costs claimed, AGP disputes a variety of the expenses but primarily argues that Mr. Knutson should not be able to recover the amount expended on his

counsel's investigator. Of the $5,871.06 in costs claimed, $3,384.00 are designated as fees for the investigator's time.

### 2. *Reasonable hourly rate*

■ "As a general rule, a reasonable hourly rate is the prevailing market rate, that is, 'the ordinary rate for similar work in the community where the case has been litigated.' " *Moysis v. DTG Datanet,* 278 F.3d 819, 828–29 (8th Cir.2002) (quoting *Emery v. Hunt,* 272 F.3d 1042, 1047 (8th Cir.2001)). Procedurally, the Supreme Court has explained that,

> To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation. A rate determined in this way is normally deemed to be reasonable, and is referred to—for convenience—as the prevailing market rate.

*Blum v. Stenson,* 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

■ Thus, the party seeking attorney's fees has the burden to prove that its request for attorney's fees is reasonable. *Johnston v. Comerica Mortg. Corp.,* 83 F.3d 241, 246 (8th Cir.1996) (citing *Hensley,* 461 U.S. at 437, 103 S.Ct. 1933). To meet its burden, the fee petitioner must "submit evidence supporting the hours worked and rates claimed." *Hensley,* 461 U.S. at 433, 103 S.Ct. 1933. In a statutory fee case, such as this one, the party opposing the fee award then has the burden to challenge, by affidavit or brief with suffi-

---

**18.** AGP also argues that Mr. Knutson should not be able to recover fees or costs for claims lost on post-trial motions. Because the court has denied AGP's motion for judgment as a matter of law, this argument on Mr. Knutson's request for attorney's fees and costs is moot.

cient specificity to give fee applicants notice, the reasonableness of the requested fee. *Bell v. United Princeton Props., Inc.,* 884 F.2d 713 (3d Cir.1989). The district court cannot decrease a fee award based on factors not raised at all by the adverse party. *Rode v. Dellarciprete,* 892 F.2d 1177, 1183 (3d Cir.1990) (quoting *Bell v. United Princeton Props., Inc.,* 884 F.2d 713, 720 (3d Cir.1989)). Once the adverse party raises objections to the fee request, the district court has a great deal of discretion to adjust the fee award in light of those objections. *Hensley,* 461 U.S. at 436–37, 103 S.Ct. 1933; *accord Philipp v. ANR Freight Sys., Inc.,* 61 F.3d 669, 675 (8th Cir.1995) (noting that "the plaintiff bears the burden of establishing an accurate and reliable factual basis for an award of attorneys' fees," and explaining that "the district court has wide discretion in making a fee award determination") (citing *Rogers v. Kelly,* 866 F.2d 997, 1001 (8th Cir.1989)).

▮ In determining a reasonable attorney fee, the district court should consider the factors set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974), though the court need not exhaustively address every factor.[19] *Emery v. Hunt,* 272 F.3d 1042, 1048 (8th Cir.2001). The Eighth Circuit Court of Appeals has recognized that it is not necessary for the district court "to examine exhaustively and explicitly, in every case, all of the factors that are relevant to the amount of a fee award," but the district court should consider what factors, "in the context of the present case, deserve explicit consideration," which may include,

for example, the number of lawyers who had previously declined to represent the plaintiff before he or she found counsel to prosecute the case, whether the plaintiff obtained relief from all of the defendants sued, and the extent of the relief obtained against any particular defendant. *Griffin v. Jim Jamison, Inc.,* 188 F.3d 996, 997–98 (8th Cir.1999). The district court should consider what factors, "in the context of the present case, deserve explicit consideration." *Griffin v. Jim Jamison, Inc.,* 188 F.3d 996, 997–98 (8th Cir.1999).

▮ In addition, the district court may consider other factors, such as the attorney's regular hourly rates, skill or representation, difficulty of work performed, and counsel's experience and reputation. *See Blum v. Stenson,* 465 U.S. 886, 895 & n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). This is so because a reasonable market rate depends in part on the "experience and skill of the attorneys" and on the rates for "similar services by lawyers of reasonably comparable skill, experience, and reputation." *Rode,* 892 F.2d at 1183. A court should also use its own knowledge, experience and expertise in determining the fee to be awarded. *Gilbert v. City of Little Rock, Ark.,* 867 F.2d 1063, 1066–67 (8th Cir.1989).

▮ In this case, Mr. Knutson's counsel, Mr. Blake Parker, has requested an hourly rate of $200. He asserts that this rate is commensurate with his experience and professional stature and is reasonable in light of the success obtained in this case and in light of the market rate for compa-

---

**19.** The *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson,* 488 F.2d at 717–19.

rable attorneys who practice primarily in employment discrimination cases. AGP, on the other hand, believes that Mr. Parker is not entitled to charge a fee in excess of $135/hour.

This court recently awarded fees in a Title VII sexual discrimination case to counsel from Sioux City, Iowa. In that case, *Baker v. John Morrell & Co.*, 263 F.Supp.2d 1161 (N.D.Iowa 2003), this court awarded plaintiff's lead counsel a claimed hourly rate of $275. In addition, lead counsel's associates were awarded hourly rates of $175 and $125. In awarding these fees, this court opined:

> Attorney's fee awards in civil rights cases are designed "to encourage the bringing of meritorious civil rights claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel." *City of Riverside v. Rivera*, 477 U.S. 561, 578, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) (referencing fee awards under 42 U.S.C. § 1988 and quoting *Kerr v. Quinn*, 692 F.2d 875, 877 (2d Cir.1982)). In specialized areas of law, such as civil rights, the national market may provide a reasonable hourly rate. *See Casey v. City of Cabool, Mo.*, 12 F.3d 799, 805 (8th Cir. 1993) ("'A national market or a market for a particular legal specialization may provide the appropriate market.'") (citation omitted). This is so because,

> > Fee awards must be structured so that attorneys of quality and experience with other profitable demands upon their time will not need to sacrifice income available in alternative enterprises in order to effect a public policy intended to protect all citizens. In other words, "the market rate of legal time is the opportunity cost of that time, the income foregone by representing this plaintiff." *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1149 (7th Cir.1993) (quoting *Barrow v.*

> > *Falck*, 977 F.2d 1100, 1105 (7th Cir. 1992)). Any other rule would relegate civil rights enforcement (and the law that results) to those lawyers with below-market billing rates. The rates for these lawyers are usually below market for a reason. A refusal to pay for the experience and expertise will exact a cost in the form of inexperience and, perhaps, incompetence.

> *Casey*, 12 F.3d at 805.

*Baker*, 263 F.Supp.2d at 1192.

Mr. Parker is a seasoned lawyer with twenty-five years of experience, and he has extensive experience in federal court, especially in employment discrimination litigation. [Parker Aff., Doc. No. 69]. He has regularly appeared before this court, and the court is very familiar with his considerable skill and ability. Mr. Parker is a skilled trial attorney whose written work is consistently of high quality, solid, and thoroughly researched. Like plaintiff's lead counsel in *Baker*, Mr. Parker, as a "trial lawyer," is a rare breed in the federal court system, at least in this District. *See Baker*, 263 F.Supp.2d at 1190 ("Trial lawyers ... who routinely try complex federal jury cases, are certainly entitled to a premium fee in comparison to litigators who push lots of papers, take lots of depositions, file lots of motions, but who seldom actually try cases in federal court. This is especially true in light of the disturbing trend of fewer and fewer civil jury trials being tried in federal courts nationwide."). The court is directed to fix hourly rates according to, among other factors, its own knowledge, experience and expertise, *Gilbert*, 867 F.2d at 1066–67. The court is familiar with the local bar and finds that the hourly rates requested for attorney services in this case are reasonable and well within the range of fees prevailing in the community for similar services by lawyers of reasonable comparable skill, expe-

rience, and reputation. In light of Mr. Parker's skill, experience, extraordinary efficiency, and the overall reasonableness of his fee request, his claimed hourly rate does not give the court pause.

Based on this court's experience, Mr. Parker is among the top employment discrimination attorneys in Iowa, and he is certainly entitled to charge comparable fees to other top civil rights lawyers. For all the above-stated reasons, the court finds that Mr. Parker's claimed rate of $200/hour is exceptionally reasonable and, therefore, will utilize this rate in arriving at the lodestar.

### 3. Hours reasonably expended

Mr. Parker has submitted time records showing that he dedicated 125.2 hours to Mr. Knutson's case. AGP's next challenge to the plaintiff's fee request targets the adequacy of the documentation of the hours expended on this case. In addition, AGP argues that Mr. Knutson's fee request should be reduced for the claims that were dismissed prior to trial. Specifically, this court granted AGP's summary judgment motion insofar as it sought judgment as a matter of law on Mr. Knutson's discharge in violation of public policy claim, and, thereafter, Mr. Knutson voluntarily dismissed the actual disability claim that survived summary judgment. Thus, Mr. Knutson recovered on only one of the four causes of action he initially brought in his complaint, and AGP contends his fees should be reduced to account for this limited success. The court will discuss these arguments in turn.

### a. Inadequate documentation of time

■■■ This court has repeatedly held that attorney fees may be reduced for inadequate documentation or poor record-keeping. See, e.g., Rural Water Sys. # 1 v. City of Sioux Center, Iowa, 38 F.Supp.2d 1057, 1063 (N.D.Iowa 1999) (cit-

ing Houghton v. Sipco, Inc., 828 F.Supp. 631, 643–44 (S.D.Iowa), vacated on other grounds, 38 F.3d 953 (8th Cir.1994)). In the face of arguments that the fees claimed are vaguely described, duplicative, or excessive for the work done, the court should carefully review the documentation supporting the fee request and provide reasons for determination of the amount awarded. See Mansker v. TMG Life Ins. Co., 54 F.3d 1322, 1330 (8th Cir.1995).

In this case, Mr. Parker submitted contemporaneous time accounts, which he compiled utilizing a computer software program that allows him to keep time in 1/10th of one hour increments. AGP objects to the summary of the time entries, such as "general case work and review" because such entries do not shed any light on whether the work was performed pursuing the dismissed claims. The court, however, finds that Mr. Parker's time is well-documented. While there is room for improvement, time documentation is not a perfect science, and Mr. Parker's time entries are significantly more detailed than that with which this court is normally presented. Moreover, in light of the overall reasonableness of Mr. Parker's fee, the court believes that a reduction for the adequacy of his documentation would not be appropriate. AGP's challenge to Mr. Parker's documentation is, in substance, a challenge as to "partial success," and not to the documentation of his time. The court turns now to this argument.

### b. Partial success/dismissed claims

The Supreme Court has explained that "The product of reasonable hours times a reasonable rate does not end the inquiry." Hensley, 461 U.S. at 434, 103 S.Ct. 1933. After examining the lodestar variables (reasonable hours expended multiplied by reasonable hourly rates), the Supreme Court directs district courts, in cases such

as this one, to ask "First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" *Id.* Having concluded that the rate charged by plaintiff's counsel is reasonable and that a reasonable number of hours were expended prosecuting Mr. Knutson's claim, the court turns now to AGP's final challenge to Mr. Knutson's fee request. AGP argues that, because Mr. Knutson prevailed on only one of the three theories of disability discrimination claims that he pleaded and not on the others nor on his discharge in violation of public policy claim, the court should reduce his fee request by as much as 50%.

The United States Supreme Court and the Court of Appeals for the Eighth Circuit have squarely addressed the "partial success" argument that the defendant urges the court to adopt here. In *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court reasoned that partial success is not a ground on which to reduce fees if the plaintiff received "excellent results" and the unsuccessful claim cannot easily be segregated from the claims on which the plaintiff prevailed:

> In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants—often an institution and its officers, as in this case—counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been "expended in pursuit of the ultimate result achieved." *Davis v. County of Los Angeles,* 8 E.P.D. ¶ 9444, at 5049 (C.D.Cal.1974). The congressional intent to limit awards to prevailing parties

requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.

> It may well be that cases involving such unrelated claims are unlikely to arise with great frequency. Many civil rights cases will present only a single claim. In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. *See Davis v. County of Los Angeles,* 8 E.P.D. ¶ 9444, at 5049[, 1974 WL 180] (C.D.Cal.1974). Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters.

*Id.* at 434–35, 103 S.Ct. 1933.

The Court of Appeals for the Eighth Circuit has similarly reasoned:

When a plaintiff has prevailed on some, but not all, of his or her claims, the court should consider the potential impact of partial success on the fee award:

> If any issues on which the plaintiff lost are unrelated to those on which he [or she] won, the unrelated issues must be treated as if they were separate cases and no fees can be awarded.... If, however, the claims on which the plaintiff lost are related to those on which he [or she] won, the court may award a reasonable fee.... The most important factor in determining what is a reasonable fee is the magnitude of the plaintiff's success in the case as a whole.... If the plaintiff has won excellent results, he [or she] is entitled to a fully compensatory fee award, which will normally include time spent on related matters on which he [or she] did not win.... If the plaintiff's success is limited, he is entitled only to an amount of fees that is reasonable in relation to the results obtained.

*Jenkins*, 127 F.3d at 716 (citations omitted). However, "[t]here is no precise rule or formula for making these determinations." *Arneson v. Callahan*, 128 F.3d 1243, 1249 (8th Cir.1997) (quoting *Hensley*, 461 U.S. at 436, 103 S.Ct. 1933). Moreover, we recall that "[b]ecause damages awards do not reflect fully the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases, unlike most private law cases, to depend on obtaining substantial monetary relief." *City of Riverside v. Rivera*, 477 U.S. 561, 574, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986). *Wal–Mart Stores, Inc. v. Barton*, 223 F.3d 770, 772–73 (8th Cir.2000) (quoting *Jenkins by Jenkins v. Missouri*, 127 F.3d 709, 718 (8th Cir.1997) (en banc)); *accord Hendrickson v. Branstad*, 934 F.2d 158, 164 (8th Cir.1991) ("A fee award should not be reduced merely because a party did not prevail on every theory raised in the lawsuit.") (citing *Hensley*, 461 U.S. at 435, 103 S.Ct. 1933); *Catlett v. Missouri Highway & Transp. Comm'n*, 828 F.2d 1260, 1270 (8th Cir.1987) (counsel should not be compensated for hours spent pursuing unsuccessful claims that are "'distinct in all respects'" from the prevailing claims) (quoting *Hensley*, 461 U.S. at 440, 103 S.Ct. 1933).

 In this case, each of Mr. Knutson's disability claims—perceived, record of, and actual—arose out of a common core of facts. That is to say, they arose out of Mr. Knutson's history of shoulder and back problems. While the court agrees that his discharge in violation of public policy claim is discrete and that time spent pursuing this claim is not compensable, this claim, too, involves some overlapping of facts. Mr. Knutson's state-law claim arose out of his contention that he was terminated because of his claim for worker's compensation benefits. Thus, investigation of Mr. Knutson's medical records and history and of the legitimacy of AGP's videotape justification for his discharge pertained to each of Mr. Knutson's claims.

Mr. Knutson achieved very good results at trial, and those results were untainted by the fact that all but one of Mr. Knutson's originally-pleaded claims were not tried. Based on the overall reasonableness of the plaintiff's fee request, his success at trial, the factual relationship connecting each of his claims, the court finds that, while some reduction for partial success is warranted, a large reduction would be unfair and out of touch with the realities of counsel's pursuit of Mr. Knutson's claims in light of the identical factual thread that ran through each of them. "Where a civil rights action involves several different claims centered on a common core of facts or legal theories, it is difficult

to divide counsel's hours on a claim-by-claim basis because much of counsel's time is generally devoted to the litigation as a whole." *Stefanoni v. Board Of Chosen Freeholders County of Burlington,* 180 F.Supp.2d 623, 634–35 (D.N.J.2002), *aff'd,* 65 Fed.Appx. 783 (3d Cir.2003) (citing *Hensley,* 461 U.S. at 433, 103 S.Ct. 1933).

The Supreme Court has stated that "[t]he district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Hensley,* 461 U.S. at 436–37, 103 S.Ct. 1933. To the extent Mr. Knutson's dismissed claims involved some limited additional work, the court will reduce Mr. Knutson's request for attorney's fees by 5% in order to account for the time spent on claims dismissed prior to trial. *See Winter v. Cerro Gordo County Conservation Bd.,* 925 F.2d 1069, 1074 (8th Cir.1991) ("When, however, 'the hours expended are not easily allocable because the unsuccessful and successful claims were related, the court may merely reduce the award in its discretion to an amount reasonable in relation to the result on the merits....'") (citation omitted). This reduction results in a reasonable attorney fee in light of the success obtained at trial and the overall reasonableness of the amount.

### 4. Calculation of attorney fee award

Having carefully and thoroughly scrutinized the record in this case, the court is left with the firm conviction that the plaintiff's fee request is extraordinarily reasonable. This case involved extensive discovery, survived summary judgment, and proceeded to a two-day trial, which was one of the most efficiently conducted jury trials over which the undersigned has presided in his nearly ten years on the bench. Fees in employment discrimination jury trials more often than not dwarf Mr. Knutson's counsel's modest request of $25,040.00. *See Warren v. Prejean,* 301

F.3d 893, 904 (8th Cir.2002) (affirming fee award requesting compensation for 825 hours in Title VII case); *Ross v. Kansas City Power & Light Co.,* 293 F.3d 1041, 1052 (8th Cir.2002) (affirming $168,551.78 in attorney fees award in employment discrimination action under § 1981); *Kline v. City of Kansas City, Mo., Fire Dep't,* 245 F.3d 707, 709 (8th Cir.2001) (affirming $277,900 in attorney fees to Title VII plaintiff); *Bridges v. Eastman Kodak Co.,* 102 F.3d 56, 58 (2d Cir.1996) (affirming Title VII attorneys' fees of $753,202.99). Mindful that "the most critical factor is the degree of success obtained," *Hensley,* 461 U.S. at 436, 103 S.Ct. 1933, the court concludes that, given the plaintiff's success and the skill, experience, and reputation of his attorney, he is entitled to most of the attorney's fees that he requested in his fee application. The court will deduct a nominal 5% from the attorney fee request in order to account for the time spent on Mr. Knutson's factually-related yet discrete wrongful discharge claim and to account for the dismissal of his alternative theories of disability discrimination. Therefore, in summary, the court will calculate the plaintiff's counsel's fee as follows: 125.2 hours × $200/hour = $25,040.00. Subtracting 5% of this total yields an attorney fee of $23,788.00.

### 5. Is Mr. Knutson's counsel entitled to an enhancement of the lodestar?

Having decided that $23,788.00 of the attorney's fees claimed in this matter were for time reasonably spent, this court has the discretion to further adjust the fee. There is a strong presumption that the lodestar figure is a reasonable fee. *Gates v. Deukmejian,* 987 F.2d 1392, 1397 (9th Cir.1992). Nevertheless, "[i]n rare circumstances the district court can increase a fee award because of the quality of the work performed or the great public importance of the case." *Shakopee Mde-*

*wakanton Sioux Cmty. v. City of Prior Lake, Minn.,* 771 F.2d 1153, 1160 (8th Cir.1985); *see also Forshee v. Waterloo Industries, Inc.,* 178 F.3d 527, 532 (8th Cir.1999) ("An upward adjustment to an attorney's lodestar hourly rate is permissible in certain 'rare' and 'exceptional' cases, supported by both 'specific evidence' on the record and detailed findings by the lower courts.") (quoting *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986)). In his fee application, Mr. Knutson requests that the court multiply his lodestar hourly rate by 1.5 in order to account for counsel's effort and the degree of success obtained.

 He claims that application of the *Johnson* factors supports his request for an enhancement, but he points to no "rare" or "exceptional" circumstances that would make an upward adjustment of the lodestar figure appropriate. The court appreciates counsel's expeditious trial management skills and considered them in making only a minimal reduction based on partial success because these skills resulted in a very reasonable overall fee request. " 'Because the lodestar amount may already compensate the applicant for exceptionally good service and results, ... the fee applicant must do more than establish outstanding service and results. The applicant also must establish that the quality of service rendered and the results obtained were superior to what one reasonably should expect in light of the hourly rates charged and the number of hours expended.' " *Forshee,* 178 F.3d at 532 (quoting *In re Apex Oil Co.,* 960 F.2d 728, 732 (8th Cir.1992)). The Ninth Circuit Court of Appeals has similarly held that "[t]he presumptively reasonable lodestar figure may be adjusted downward or upward *only on the basis of those factors not already subsumed in the lodestar calculation.*" *Morales v. City of San Rafael,* 96 F.3d 359, 363–64 (9th Cir.1996), *amended on other*

*grounds,* 108 F.3d 981 (9th Cir.1997) (emphasis added).

It is the court's opinion that counsel's $200 hourly rate is adequate compensation for Mr. Parker's services in this matter. Moreover, while a prevailing party, Mr. Knutson did not achieve particularly exceptional results. As stated above, he proceeded to trial on only one of his four claims and, at trial, did not recover all the relief he sought. In addition, counsel admits in his affidavit that the case was not particularly difficult or complex. Thus, assuming the court has discretion to adjust counsel's fee above the lodestar rate in this case, the court finds that such an adjustment is not. Thus, the attorney's fee award in this case stands at $23,788.00, and the court turns now to the costs and expenses claimed by the plaintiff.

### D. Recoverable Costs and Expenses

 As part of his fee request, the plaintiff seeks an award of $5,871.06 in costs and expenses. In civil rights cases, the trial court has the power to award costs to the prevailing party. *See* 42 U.S.C. § 2000e–5(k). Such awards are controlled by Federal Rule of Civil Procedure 54(d)(1). *See, e.g., Phetosomphone v. Allison Reed Group, Inc.,* 984 F.2d 4, 9 n. 6 (1st Cir.1993); *Washington v. Patlis,* 916 F.2d 1036, 1039–40 (5th Cir.1990) (per curiam); *see also DiSalvo v. Chamber of Commerce of Greater Kansas City,* 568 F.2d 593 (8th Cir.1978) (implicit); *Boyd v. Ozark Air Lines, Inc.,* 568 F.2d 50 (8th Cir.1977) (implicit). Rule 54(d) creates a presumption in favor of awarding costs to the prevailing party. *Coyne–Delany Co. v. Capital Dev't Bd.,* 717 F.2d 385, 390 (7th Cir.1983). District courts possess wide discretion in determining whether expenses claimed by the prevailing party are actually taxable as costs. *Deimer v. Cincinnati Sub–Zero Prods., Inc.,* 58 F.3d 341, 345 (7th Cir.1995). Nevertheless, as

the Supreme Court has explained, Rule 54(d) does not give a court "unrestrained discretion to tax costs to reimburse a winning litigant for every expense he has seen fit to incur. . . . [I]tems proposed by winning parties as costs should always be given careful scrutiny." *Farmer v. Arabian Am. Oil Co.,* 379 U.S. 227, 235, 85 S.Ct. 411, 13 L.Ed.2d 248 (1964).

Rule 54(d) works in tandem with 28 U.S.C. § 1920. The taxable costs which may be recovered as specified in 28 U.S.C. § 1920 include: (1) fees of the clerk; (2) fees for transcripts; (3) fees for printing and witnesses; (4) fees for copies of papers "necessarily" used in the case; (5) docketing fees; and (6) compensation of court-appointed experts and interpreters. 28 U.S.C. § 1920. However, 28 U.S.C. § 1920 is not the court's sole source of authority in determining which costs and expenses are recoverable by a prevailing party.

■■■ Title 42 U.S.C. § 1988(b) provides: "In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs. . . ." Some "costs" that are not available under 28 U.S.C. § 1920 are recoverable as "reasonable out-of-pocket expenses of the kind normally charged to clients by attorneys, and thus should [be] included as part of the reasonable attorney's fees awarded" under 42 U.S.C. § 1988. *Pinkham v. Camex, Inc.,* 84 F.3d 292, 294–95 (8th Cir.1996) (per curiam) (citations omitted); *accord Martin v. City of Indianapolis,* 28 F.Supp.2d 1098, 1107 (S.D.Ind.1998) ("[S]ome of the costs listed by [plaintiff's] counsel, including travel expenses, long-distance telephone calls, photocopying services and express mail charges, are more properly labeled 'litigation expenses,' which generally are com-

pensable as part of a reasonable attorney's fee, rather than costs."), *aff'd,* 192 F.3d 608 (7th Cir.1999) (citing *Pinkham,* 84 F.3d at 294–95); *Downes v. Volkswagen of Am., Inc.,* 41 F.3d 1132, 1144 (7th Cir.1994); *Bennett v. Central Telephone Co. of Ill.,* 619 F.Supp. 640, 643 n. 1 (N.D.Ill.1985) ("Such expenses are consistently treated as recoverable as part of 'attorneys' fees' in the broad sense"); *Schultz v. Amick,* 955 F.Supp. 1087, 1116 (N.D.Iowa 1997) (same); *Johnson v. Mortham,* 950 F.Supp. 1117, 1126–1127 & n. 11 (N.D.Fla.1996) (reasonable costs and allowable expenses of attorney include "reproduction expenses, telephone expenses of the attorney, travel time and expenses of the attorney, and postage"); *Chicago Professional Sports Ltd. Partnership v. National Basketball Ass'n,* 1992 WL 584077 at * 3 (N.D.Ill.Dec.21, 1992) (out-of-pocket expenses may include "telecopy charges"); *cf. Hemmings v. Tidyman's Inc.,* 285 F.3d 1174, 1200 (9th Cir.2002), *cert. denied,* 537 U.S. 1110, 123 S.Ct. 854, 154 L.Ed.2d 781 (2003) (recoverable costs under Title VII may include deposition costs) (citing *Harris v. Marhoefer,* 24 F.3d 16, 19 (9th Cir.1994)).

### 1. Charges for the investigator

■■■ As noted above, Mr. Parker has requested compensation for the employment of a legal investigator in the amount of $3,384.00. He submitted detailed time entries for the investigator's charges and requests compensation at the rate of $45/ hour. In his affidavit in support of the fee petition, Mr. Parker states that he employs a legal investigator who interviews witnesses, performs witness preparation, prepares documents, and assists with trial preparation. Though he admits that few law firms employ an "investigator," Mr. Parker has determined that use of an investigator is the most efficient utilization

of support staff for performing the tasks that he assigns to the investigator.

AGP objects to the hourly rate charged by the investigator. AGP notably does not dispute Mr. Knutson's entitlement to recover the costs of the investigator, instead challenging the amount to which the plaintiff is entitled. In his affidavit, Mr. Parker attests to the reasonableness of the investigator's fee and asserts that he has consulted with other law firms in arriving at the $45/hour rate. The court is satisfied that this rate is reasonable and that the hours expended on this case were reasonable and, moreover, adequately documented. Therefore, the court will not reduce Mr. Knutson's fee request on these grounds.

### 2. Other expenses

 AGP also objects to charges for photocopying, mileage, and the transfer of an 8 mm tape to VHS videotape. However, AGP does not give any reason why the costs are unreasonable. The plaintiff claims expenses of $472.50 for photocopies, $54.29 for postage, $15.80 for long distance charges, $150.00 for filing fees, $134.00 for a copy of the Iowa Civil Rights Commission file on plaintiff's case, $1,581.18 for deposition expenses, $6.69 for electronic research, $15.00 for medical records, $47.00 for mileage, and $10.60 for transfer of the 8 mm tape to VHS video. The expenses claimed are reasonable and are approved.[20]

### III. CONCLUSION

The court has considered each of the grounds raised in AGP's Motion for Judgment as a Matter of Law, or, Alternatively, for New Trial, and concludes that the mo-

tion must be **denied.** The court also concludes that Mr. Knutson is entitled to reinstatement to his former position as a boiler operator; thus, his Motion for Prohibitory Injunction, for Reinstatement is **granted.** AGP **shall reinstate Mr. Knutson** to the position of boiler operator in its Eagle Grove, Iowa plant. Upon his reinstatement, AGP is hereby **enjoined from any further perceptions of disability discrimination and any retaliatory conduct** toward Mr. Knutson.

The court also **grants** the plaintiff's Motion for Attorney's Fees and Costs, having concluded that Mr. Knutson is entitled to attorney's fees in the amount of $23,788.00 and expenses in the amount of $5,871.06. Thus, adding these amounts together, the total of Mr. Knutson's **attorney's fees and costs** award is **$29,659.06.**

In addition, this attorney fee represents counsel's time and expenses through the date the fee application was filed, March 13, 2003. The court recognizes that additional service was provided to defend against the defendant's motion for judgment as a matter of law and that Mr. Knutson requested the opportunity to supplement his fee request. The **plaintiff shall have to and including August 11, 2003 in which to file a supplemental fee application** for fees and expenses incurred subsequent to the date of the fee petition. The **defendant shall then have to and including August 18, 2003 in which to file a response** to the plaintiff's supplemental fee petition.

The clerk of court shall also enter judgment on the jury's award of **backpay,** in

---

**20.** Pursuant to 28 U.S.C. § 1920, the plaintiff filed a bill of costs requesting reimbursement for his filing fees and depositions costs. He has sought reimbursement for these same costs in his Motion for Attorney's Fees and Costs. Because, of course, he is not entitled to recoup these identical costs twice, this court's ruling on his Motion for Attorney's Fees and Costs disposes of the pending bill of costs, Doc. No. 71.

the amount of **$55,345.72,** and **punitive damages,** in the amount of $90,000.00.

**IT IS SO ORDERED.**